# Kathleen DeBruin, Plaintiff-Appellant,

v.

# St. Patrick Congregation, Defendant-Respondent.

Supreme Court

*No. 2010AP2705. Oral argument March 13, 2012.*
*—Decided July 12, 2012.*

## 2012 WI 94

(Also reported in 816 N.W.2d 878.)

For the plaintiff-appellant, there was a brief filed by *Alan C. Olson* and *Alan C. Olson & Associates, S.C.,* New Berlin, and oral argument by *Alan C. Olson.*

For the defendant-respondent, there was a brief filed by *Nick G. Kotsonis* and *Zachary J. Davis* and *Crivello Carlson, S.C.,* Milwaukee, and oral argument by *Nick G. Kotsonis.*

¶ 1. PATIENCE DRAKE ROGGENSACK, J. This is an appeal from a decision of the Circuit Court for Walworth County[1] that the court of appeals has certi-

---

[1] The Honorable John R. Race presided.

fied to us pursuant to Wis. Stat. § 809.61 (2009–10).[2] We are asked to decide whether, under the First Amendment of the United States Constitution and Article I, Section 18 of the Wisconsin Constitution, Kathleen DeBruin's complaint against St. Patrick Congregation (St. Patrick), alleging that her employment was terminated for an improper reason, states a claim upon which relief may be granted. We conclude that it does not. Permitting the continuation of this type of breach of contract or promissory estoppel claim by a ministerial employee,[3] who seeks payment based on an allegedly improper reason for being terminated from her employment, would impermissibly interfere in a religious institution's choice of ministerial employees, in violation of the First Amendment of the United States Constitution and Article I, Section 18 of the Wisconsin Constitution.

¶ 2. Therefore, a court may not review whether St. Patrick improperly terminated its ministerial employee because St. Patrick's choice of who shall serve as its ministerial employee is a matter of church governance protected from state interference by the First Amendment and by Article I, Section 18. Accordingly, DeBruin's complaint, which would require a state court to evaluate *why* St. Patrick terminated its ministerial employee, fails to state a claim upon which a court may grant relief. Therefore, the circuit court correctly dis-

[2] All subsequent references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

[3] The term "ministerial employee" refers to a certain type of employee of a religious institution whose work is fundamentally tied to the institution's religious mission. *See Coulee Catholic Sch. v. LIRC,* 2009 WI 88, ¶¶ 41–49, 320 Wis. 2d 275, 768 N.W.2d 868. As discussed below, it is undisputed that DeBruin was a ministerial employee.

missed DeBruin's complaint, and its decision is affirmed.[4]

## I. BACKGROUND

¶ 3. St. Patrick is a Catholic church in the Archdiocese of Milwaukee. DeBruin began working for St. Patrick in August 2002. On July 1, 2009, St. Patrick entered into a written, one-year employment contract with DeBruin as the Director of Faith Formation. The contract described DeBruin's duties, the annual salary and fringe benefits to which DeBruin would be entitled, the term of the contract, the facilities to which DeBruin would have access as Director of Faith Formation, and the procedures for employee evaluation and annual contract renewal. Additionally, the contract included provisions governing termination of the employment relationship. Relevant to this appeal, the contract provided:

> The PARISH agrees that the DIRECTOR OF FAITH FORMATION shall not be discharged during the term of this contract, without good and sufficient cause, which shall be determined by the PARISH. The PARISH agrees that the Pastor of the PARISH will be responsible for giving the employee notice of any dissatisfaction with service or conduct. Dismissal may be immediate or within a time frame determined by the PARISH.

¶ 4. On October 5, 2009, St. Patrick terminated DeBruin's employment. It is undisputed that DeBruin

---

[4] Five justices affirm the judgment of the circuit court. Three justices, Justice Patience Drake Roggensack, Justice Annette Kingsland Ziegler and Justice Michael J. Gableman, join this lead opinion. Two justices, Justice N. Patrick Crooks and Justice David T. Prosser, base their decisions on the specific contract at issue in this case.

is a ministerial employee.[5] It is also undisputed that St. Patrick has paid DeBruin for all of the services she rendered prior to her termination.

¶ 5. In early December 2009, DeBruin filed this lawsuit against St. Patrick. She alleges breach of contract, asserting that St. Patrick terminated her employment "without good and sufficient cause as that term is defined by the Contract of Employment," and promissory estoppel, based on the same assertion. She seeks payment of $34,150.27, plus interest on that amount. DeBruin asserts that this amount constitutes damages for the period between October 5, 2009, when her employment was terminated, and June 30, 2010, the end of the term of the written contract. Therefore, the damages DeBruin now seeks comprise payments for salary that would have been due if St. Patrick had retained her employment through the full term of the contract.

¶ 6. St. Patrick did not move to dismiss DeBruin's complaint on the basis that St. Patrick terminated DeBruin for "good and sufficient cause" within the meaning of the employment contract. Instead, relying on our decision in *Coulee Catholic Schools v. LIRC,* 2009 WI 88, 320 Wis. 2d 275, 768 N.W.2d 868, St. Patrick moved to dismiss DeBruin's complaint for failure to state a claim upon which relief may be granted, pursuant to Wis. Stat. § 802.06(2)(a)6. St. Patrick asserted that both the First Amendment of the United States Constitution and Article I, Section 18 of the Wisconsin Constitution preclude DeBruin, as a ministerial employee, from obtaining court enforcement of

---

[5] Unlike in *Coulee,* 320 Wis. 2d 275, ¶¶ 68–87, where there was a dispute between the parties about whether the teacher was a ministerial employee, here, DeBruin concedes that her status was that of a ministerial employee.

her claims of breach of contract or promissory estoppel based on the allegation that St. Patrick terminated her employment for an improper reason.

¶ 7. At the hearing on St. Patrick's motion to dismiss, St. Patrick argued that, under *Coulee,* the court could not review St. Patrick's decision to terminate DeBruin. Specifically, St. Patrick noted that DeBruin conceded that she was a ministerial employee and that St. Patrick is a religious institution. With these two concessions, St. Patrick argued that, under *Coulee,* state court review of St. Patrick's reason for terminating DeBruin would constitute impermissible interference with St. Patrick's religious mission, in violation of the First Amendment and Article I, Section 18.

¶ 8. DeBruin responded by arguing that *Coulee* was inapposite in the context of her complaint, because the state antidiscrimination law at issue in *Coulee* was distinguishable from the neutral principles of law governing contracts and promissory estoppel that would be applied in this dispute. DeBruin claimed that applying such neutral principles of law would not constitute impermissible government action because the court could examine DeBruin's complaint and determine the truth or falsity of her allegations without interfering with the religious institution's mission. Therefore, notwithstanding DeBruin's concessions that she satisfied both parts of the *Coulee* ministerial employee inquiry, she argued that her complaint could go forward.

¶ 9. After hearing arguments on St. Patrick's motion, the circuit court dismissed DeBruin's complaint. The court agreed with St. Patrick that because St. Patrick is a religious institution and because DeBruin was a ministerial employee, pursuant to our decision in *Coulee,* DeBruin's complaint failed to state a claim upon

which relief could be granted. DeBruin appealed, and the court of appeals certified the matter to us. We accepted the certification.

## II. DISCUSSION

### A. Standard of Review

██

¶ 10. We independently review as a question of law whether a complaint states a cognizable claim. *John Doe 1 v. Archdiocese of Milwaukee,* 2007 WI 95, ¶ 12, 303 Wis. 2d 34, 734 N.W.2d 827. We also independently review St. Patrick's assertion that the First Amendment of the United States Constitution and Article I, Section 18 of the Wisconsin Constitution require dismissal of DeBruin's claims. *See Jackson v. Benson,* 218 Wis. 2d 835, 852–53, 578 N.W.2d 602 (1998).

### B. Failure to State a Claim

██

¶ 11. St. Patrick's motion to dismiss DeBruin's complaint was granted at the pleading stage. Such a motion tests the legal sufficiency of the complaint. *John Doe 1,* 303 Wis. 2d 34, ¶ 12. For purposes of the motion, we accept as true all facts well-pleaded in the complaint and the reasonable inferences therefrom. *Kaloti Enters., Inc. v. Kellogg Sales Co.,* 2005 WI 111, ¶ 11, 283 Wis. 2d 555, 699 N.W.2d 205. We will dismiss a complaint if it states no legal claim upon which relief can be granted. *Id.*

¶ 12. St. Patrick asserts that the First Amendment and Article I, Section 18 preclude court review of its reason for terminating DeBruin's employment. There-

fore, a court must review the complaint, which incorporates and attaches a copy of DeBruin's employment contract, in light of the effect of the First Amendment and Article I, Section 18 on St. Patrick's decision to terminate DeBruin's employment.

## 1. First Amendment

■

¶ 13. The First Amendment of the United States Constitution provides in relevant part: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const. amend. I. The First Amendment is made applicable to the states by the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940). First Amendment protections are afforded to institutions, as well as to individuals. *Coulee,* 320 Wis. 2d 275, ¶ 38.

■■

¶ 14. The Fourteenth Amendment does not apply the First Amendment to purely private conduct. Rather, it is when state action infringes on constitutionally protected rights that the Fourteenth Amendment comes into play. *See Shelley v. Kraemer,* 334 U.S. 1, 13 (1948). *Shelley* arose in the context of an equal protection challenge to state court enforcement of a private, racially discriminatory restrictive covenant. *Id.* at 4–8. Nonetheless, the constitutional principles that underlie *Shelley* are analogous to other constitutional protections, including those afforded by the First Amendment.

¶ 15. To explain further, *Shelley* did not begin with governmental action; but rather, it began as racial discrimination in a restrictive covenant, i.e., in a private contract. Kraemer, who was Caucasian and a party

to the covenant, sought to enforce the covenant against Shelley, who was African-American and had purchased the property encumbered by the covenant. *Id.* at 4–6. The participation of the State did not become an issue until Kraemer sought court enforcement of the restrictive covenant. *Id.* at 13. The Court explained that, "restrictions on the right of occupancy of the sort sought to be created by the private agreements . . . could not be squared with the requirements of the Fourteenth Amendment if imposed by state statute or local ordinance." *Id.* at 11. However, the court also explained that "[s]o long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State." *Id.* at 13.

¶ 16. There was more than voluntary adherence to a private agreement in *Shelley*. Instead, a party to the discriminatory restrictive covenant sought enforcement in state court, thereby asking the State to participate in the discrimination. *Id.* With the extra step of judicial intervention, the Supreme Court concluded that judicial intervention constituted state action. *Id.* at 14.

¶ 17. In reasoning that court enforcement of a private discriminatory contract constituted state action, the Court said, "[t]hat the action of state courts and judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court." *Id.* at 14. The Court pointed out that it was "clear that but for the active intervention of the state courts, supported by the full panoply of state power, petitioners would have been free to occupy the properties in question without restraint." *Id.* at 19. Accordingly, *Shelley* concluded that

97

when constitutionally protected rights were at issue and a contravention of those rights could not be accomplished without state action, court enforcement constituted state action of the type that was proscribed by the Fourteenth Amendment. *Id.*

¶ 18. So, too, in the case before us, DeBruin seeks state court enforcement of a provision in a private contract in order to invalidate St. Patrick's reason for terminating her employment. However, the First Amendment grants religious institutions " 'independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.' " *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. __, 132 S. Ct. 694, 712 (2012) (Alito, J., concurring) (quoting *Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). Therefore, DeBruin asks the state courts to engage in activity that the Constitution prohibits.

¶ 19. In *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich*, 426 U.S. 696 (1976), the Supreme Court reviewed state court action in the context of a religious institution's termination of one of its ministers. In *Serbian Eastern Orthodox Diocese*, the Holy Synod of Bishops, the Church's highest governing body, applied church rules to defrock a church bishop, Dionisije Milivojevich. *Id.* at 699, 705–07. Milivojevich brought suit in state court, seeking, among other claims, "to have himself declared the true Diocesan Bishop." *Id.* at 707. The Illinois Supreme Court held that Milivojevich's removal as bishop was "arbitrary," and therefore, the court set it aside. *Id.* at 708.

98

¶ 20. In reversing the Illinois Supreme Court, the United States Supreme Court explained that "[t]he fallacy fatal to the judgment of the Illinois Supreme Court is that it rests upon an impermissible rejection of the decisions of the highest ecclesiastical tribunals . . . and impermissibly substitutes its own inquiry into church polity." *Id.* The Court explained:

> For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them.

*Id.* at 713. Accordingly, church decisions in matters of faith and ministry are so fundamental to the free exercise of religious liberty that civil courts are prohibited from delving into the reasons for religion-based decisions.[6] *Id.*

---

[6] The dissent asserts that this opinion conflates the Free Exercise Clause and the Establishment Clause in its First Amendment analysis. *See, e.g.,* dissent, ¶ 135. In particular, the dissent cites the use of *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich,* 426 U.S. 696 (1976), as an example of such conflation, claiming that case is "a classic Establishment Clause case." Dissent, ¶ 136 n.11. However, the dissent is mistaken; *Serbian Eastern Orthodox Diocese* is a Free Exercise case. This interpretation is shared by

¶ 21. Although the opinion does not cite *Shelley,* *Serbian Eastern Orthodox Diocese* is consistent with *Shelley* because, like *Shelley, Serbian Eastern Orthodox Diocese* involved state court adjudication of privately created rights. Specifically, in *Serbian Eastern Orthodox Diocese,* the complainant asked the courts to evaluate the Holy Synod's application of church rules to the ecclesiastical decision about whether to defrock a bishop. *See id.* at 708. No state or federal statute was involved in or cited by the Supreme Court in *Serbian Eastern Orthodox Diocese.*

¶ 22. Included within the decisions protected by the First Amendment are the hiring and firing of ministerial employees, regardless of the motivation behind those decisions. *Young v. N. Ill. Conference of United Methodist Church,* 21 F.3d 184, 186 (7th Cir. 1994); *see also Rayburn v. Gen. Conference of Seventh-Day Adventists,* 772 F.2d 1164, 1169 (4th Cir. 1985). Accordingly, religious institutions may make arbitrary decisions regarding hiring or firing of ministerial em-

the following opinions, all of which cite *Serbian Eastern Orthodox Diocese* as a Free Exercise case: *Petruska v. Gannon University,* 462 F.3d 294, 306 (3d Cir. 2006); *Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1359–60 (D.C. Cir. 1990); *Rayburn v. General Conference of Seventh-Day Adventists,* 772 F.2d 1164, 1167–68 (4th Cir. 1985).

The dissent attempts to set aside the conclusions of *Petruska, Rayburn* and *Minker* that cite *Serbian Eastern Orthodox Diocese* as support for discussion of the Free Exercise Clause of the First Amendment. Dissent, ¶ 136 n.11. It does so by quoting articles that generally discuss First Amendment cases without analyzing a case or controversy as court decisions do. *Id.* Scholarly discussions are always of interest, but they do not address First Amendment principles in the context of a case or controversy, as judicial opinions do.

ployees and nevertheless be free from civil review for having done so. *Serbian Eastern Orthodox Diocese,* 426 U.S. at 708–09; *Young,* 21 F.3d at 187.

¶ 23. It has been universally recognized that the First Amendment protects religious institutions' decisions about whom to hire as ministerial employees and when to terminate their employment. *Coulee,* 320 Wis. 2d 275, ¶ 39. Accordingly, a terminated ministerial employee's complaint alleging that her religious institution employer terminated her for an improper reason is not viewed through the lens that we usually apply when examining the legal sufficiency of a complaint. *See Hosanna-Tabor,* 132 S. Ct. at 706. Rather, the allegations in the complaint are viewed in the context of the First Amendment's proscriptions against state interference with religious institutions' choices of who shall be the voice of their faith. *Id.* at 706–08. As Justice Alito explained in *Hosanna-Tabor,* "Religious autonomy means that religious authorities must be free to determine who is qualified to serve in positions of substantial religious importance." *Id.* at 712 (Alito, J., concurring).

¶ 24. When a ministerial employee is terminated, the religious institution's decision about who shall teach its faith and how that shall be done are intertwined with the decision to terminate the employee. Courts can have no role in affirming or overturning such a decision based on the reason why the religious institution terminated the employment. As the United States Supreme Court has explained:

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so,

101

intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs.

*Id.* at 706. We voiced the same concept in *Coulee* when we explained, "the real heart of the ministerial exception . . . is preventing the state from intruding into the mission of religious organizations or houses of worship." *Coulee,* 320 Wis. 2d 275, ¶ 55.

### 2. DeBruin's complaint

¶ 25. Turning to DeBruin's complaint, she seeks court participation in enforcing a private contract against St. Patrick, as Kraemer did against Shelley. *See Shelley,* 334 U.S. at 4–6. DeBruin seeks money damages from St. Patrick, alleging that St. Patrick terminated her employment for an improper reason. She alleges that her contract with St. Patrick limited the reasons for which St. Patrick could terminate her employment to "good and sufficient cause," and that her termination was not done within that contractual limitation. As we review her complaint, we note that DeBruin is *not* seeking payment for services she has already provided.[7]

¶ 26. It is important to a proper First Amendment analysis of DeBruin's complaint to focus on the nature of the protections that are afforded to religious institutions and why they are afforded. To examine whether

---

[7] Were DeBruin seeking contract damages for past services provided, her claim would be much like the corner grocer who delivers food to a parish, sends a bill and remains unpaid for that which he has provided. Court adjudication of that type of breach of contract claim would not run afoul of the First Amendment because it would not require a court to examine the ecclesiastical decision to terminate a ministerial employee.

St. Patrick could enter into a contract with DeBruin and how that contract may be interpreted, frames the issue too broadly and is not required by the issue presented in this case.[8] Furthermore, beginning with a contract analysis would cause a court to diminish the priority given to the policies that drive the First Amendment and would lead a court to err.

██ ██

¶ 27. The First Amendment grants St. Patrick free choice in deciding that a ministerial employee should be terminated because it is that type of employee "who will preach [religious institutions'] beliefs, teach their faith, and carry out their mission." *Hosanna-Tabor,* 132 S. Ct. at 710. As the Supreme Court has explained, when a ministerial employee sues her religious employer to contest the validity of the reason for which she was fired, "the First Amendment has struck the balance for us. The church *must be free to choose* those who will guide it on its way." *Id.* (Emphasis

---

[8] We acknowledge there are matters for which a religious institution may contract that would be appropriate to enforce in the courts. *See, e.g., Jones v. Wolf,* 443 U.S. 595, 602–04 (1979) (concluding that courts may dispose of cases involving property belonging to religious institutions on the basis of "neutral principles of law" if the judicial inquiry can be conducted in exclusively secular terms). However, the *Jones* approach has never been employed in cases where a minister was terminated. Furthermore, *Hosanna-Tabor* reaffirmed that the "neutral principles" language from *Jones* applies to the "regulation of only outward physical acts," not to "government interference with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor,* 132 S. Ct. at 707. That conclusion is consistent with *Coulee,* which concluded that the plaintiff's claim was barred despite the contention that neutral and generally applicable employment laws could have settled the dispute. *Coulee,* 320 Wis. 2d 275, ¶¶ 3, 39 n.13.

added.) Stated otherwise, the First Amendment restrains the State from invalidating the institution's reasons that underlie its choice.

■

¶ 28. St. Patrick fired DeBruin, a ministerial employee. If DeBruin were not a ministerial employee and made the same claim, we might interpret the contract and consider whether St. Patrick had "good and sufficient cause" for DeBruin's termination. However, the First Amendment gives St. Patrick the absolute right to terminate DeBruin for any reason, or for no reason, as it freely exercises its religious views. It is the decision itself, i.e., who shall be the voice of St. Patrick, that affects the faith and mission of the church. *Serbian Eastern Orthodox Diocese,* 426 U.S. at 713; *Young,* 21 F.3d at 186–87; *Rayburn,* 772 F.2d at 1169.

■

¶ 29. The dissent relies on *Petruska v. Gannon University,* 462 F.3d 294 (3d Cir. 2006), to support its decision not to dismiss DeBruin's contract claim.[9] Petruska claimed that reducing her pastoral responsibilities was a breach of her contract with Gannon University. *Id.* at 310. At one point, the court acknowledged that if judicial review of the contract claim entailed "ecclesiastical inquiry," the claim could not proceed. *Id.* at 312. However, any inquiry into the validity of a religious institution's reasons for the firing of a ministerial employee will involve consideration of ecclesiastical decision-making. *See Combs v. Cent. Tex. Annual Conference of the United Methodist Church,* 173 F.3d 343, 350 (5th Cir. 1999) (stating that "we cannot conceive how the federal judiciary could determine whether an employment decision concerning a minister

---

[9] Dissent, ¶ 122.

was based on legitimate or illegitimate grounds without inserting ourselves into a realm where the Constitution forbids us to tread, the internal management of a church").

██

¶ 30. Accordingly, a court cannot interpret DeBruin's contract with St. Patrick to determine whether St. Patrick had "good and sufficient cause" to terminate DeBruin because in so doing, the court would infringe upon St. Patrick's First Amendment right to freely exercise its religious preferences and thereby be the sole decision-maker about who will preach its beliefs, teach its faith and carry out its mission. As the United States Supreme Court has explained:

> By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Hosanna-Tabor,* 132 S. Ct. at 706.

██ ██

¶ 31. Where a plaintiff alleges that her termination was based on an improper reason, it does not matter whether she seeks damages based on a contract theory or a statutory theory. In either case, the State is effectively enjoined by the First Amendment from interfering with the religious institution's right to choose its own ministers. *Serbian Eastern Orthodox Diocese,* 426 U.S. at 708–09. The Free Exercise Clause of the First Amendment guarantees religious freedom from

the State's imposition of an unwanted minister on a religious institution. *Hosanna-Tabor,* 132 S. Ct. at 710.

¶ 32. Stated otherwise, if DeBruin's claim is not dismissed, a court will be required to decide whether St. Patrick terminated DeBruin without "good and sufficient cause," within the meaning of those terms in the contract. A court may then bring to bear legal concepts relative to contract interpretation and performance, such as whether St. Patrick proceeded in good faith when it terminated DeBruin. *See Chayka v. Santini,* 47 Wis. 2d 102, 107 n.7, 176 N.W.2d 561 (1970) (explaining that every contract includes the obligation of good faith and fair dealing between the parties). Questioning St. Patrick's good faith will permit a challenge to its reasons for terminating DeBruin. The First Amendment does not permit the State to interfere with St. Patrick's free exercise of the choice of religious minister for its religious beliefs. *Hosanna-Tabor,* 132 S. Ct. at 707.

¶ 33. Furthermore, if a court were to award damages on DeBruin's claim, which does not relate to services she has already provided, St. Patrick would be required, by the State, to pay for its decision to terminate an unwanted ministerial employee. *See id.* at 709. This, the First Amendment does not permit. *See id.* As the United States Supreme Court has said, "[a]n award of such relief would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination." *See id.*

¶ 34. Furthermore, while *Hosanna-Tabor* did not arise in a contract context, which the Supreme Court noted, *id.* at 710, the First Amendment protections that drove the result in *Hosanna-Tabor* are the same protections that bear on DeBruin's claim for damages to

compensate her for the denial of prospective employment. In addition, *Serbian Eastern Orthodox Diocese,* which did not arise in a discrimination claim context, and is based on the Free Exercise Clause, employs discussions of state limitations that are very similar to *Hosanna-Tabor* and support St. Patrick's position.

¶ 35. Accordingly, we conclude that DeBruin's complaint, viewed through a First Amendment lens, fails to state a claim upon which a court may grant relief. Stated otherwise, the State is effectively enjoined by the First Amendment from interference with such ecclesiastical decisions.

### 3. Article I, Section 18

¶ 36. Article I, Section 18 of the Wisconsin Constitution provides in relevant part: "The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent . . . ." Wis. Const. art. I, § 18. Article I, Section 18 applies to religious institutions, as well as to individuals. *Coulee,* 320 Wis. 2d 275, ¶ 58.

¶ 37. We have concluded that Article I, Section 18 serves similar purposes in regard to protecting religious freedoms as do the Establishment Clause and the Free Exercise Clause of the First Amendment. *Id.,* ¶ 60 (citing *State ex rel. Warren v. Nusbaum,* 55 Wis. 2d 316, 332, 198 N.W.2d 650 (1972)). Given the expansive language employed in Article I, Section 18, the protections afforded religious liberties therein are at least as broad as those afforded by the First Amendment. *Id.,* ¶ 66. More specifically, we have concluded that Article I,

Section 18 precludes state interference with religious organizations' hiring and firing of ministerial employees. *Id.*, ¶ 67. Accordingly, we conclude that Article I, Section 18 provides an additional basis, independent of the First Amendment, for dismissing DeBruin's complaint.

## III. CONCLUSION

¶ 38. Permitting the continuation of this type of breach of contract or promissory estoppel claim by a ministerial employee, who seeks payment based on an allegedly improper reason for being terminated from her employment, would impermissibly interfere in a religious institution's choice of ministerial employee, in violation of the First Amendment of the United States Constitution and Article I, Section 18 of the Wisconsin Constitution.

¶ 39. Therefore, a court may not review whether St. Patrick improperly terminated its ministerial employee because St. Patrick's choice of who shall serve as its ministerial employee is a matter of church governance protected from state interference by the First Amendment and by Article I, Section 18. Accordingly, DeBruin's complaint, which would require a court to evaluate *why* St. Patrick terminated its ministerial employee, fails to state a claim upon which a court may grant relief. Therefore, the circuit court correctly dismissed DeBruin's complaint, and its decision is affirmed.[10]

*By the Court.*—The judgment of the circuit court is affirmed.

---

[10] Some cases imply that a religious institution may waive its right to challenge civil court determinations of disputes for which the First Amendment would otherwise preclude judicial intervention. *See Alicea v. New Brunswick Theological Seminary,* 608 A.2d 218, 224 (N.J. 1992). Although waiver is not at

¶ 40. N. PATRICK CROOKS, J. (*concurring*). This is an employment contract dispute that centers on the contract's termination clause, and it requires the application of well-established contract principles. The analysis in such a case starts with the terms of the contract. The termination clause in this case contains a highly unusual and crucial provision: it states that the employee "shall not be discharged during the term of this contract, without good and sufficient cause, which shall be determined by the [employer]." What is unusual, of course, is that the contract explicitly and by agreement leaves the determination of "good and sufficient cause" to be determined by one party: the employer. Those words are the key to the proper analysis of this case because, when viewed in light of well-established principles of contract law, they reveal the termination clause to be a textbook case of an illusory promise—"words in promissory form that promise nothing."[1] Wisconsin precedent on this score is clear: "If a party to a purported contract has, in fact, made only illusory promises and therefore not constrained him- or herself in any way, he or she has given no consideration and therefore no contract exists. Because no contract exists, neither party has a cause of action for breach."[2] In other words, as described in one treatise on contracts citing case law, where the contract indicates that a party may at its own option decide to

---

issue here, it is important to note that both the Establishment Clause and the Free Exercise Clause of the First Amendment encompass societal interests as well as personal protections.

[1] 2 Joseph M. Perillo & Helen Hadjiyannakis Bender, *Corbin on Contracts* § 5.28, at 142 (rev. ed. 1995).

[2] *Devine v. Notter*, 2008 WI App 87, ¶ 4, 312 Wis. 2d 521, 753 N.W.2d 557 (internal citations omitted).

terminate, termination is not a breach but is "merely the exercise of the reserved power to terminate."[3]

¶ 41. To resolve a contract case, we start by looking at the contract terms, and we give effect to its terms unless they are ambiguous.[4] In the purported contract at issue here the parties, Kathleen DeBruin and her employer, St. Patrick Congregation (the Parish), unambiguously reserved solely to the employer the right to determine what is just cause for termination. For that reason, I would affirm the circuit court's dismissal of the complaint, but on the grounds that the purported contract is based on an illusory promise which cannot serve as consideration for a contract, and therefore no enforceable contract exists. The promissory estoppel claim fails for an almost identical reason: a promissory estoppel claim is based on a promise, and where there is nothing but an illusory promise, there is no basis for reliance.[5]

---

[3] 1 Joseph M. Perillo, *Corbin on Contracts* § 4.2, at 556 (rev. ed. 1993).

[4] The primary goal in contract interpretation is to give effect to the parties' intent, as expressed in the contractual language. We interpret the language consistent with what a reasonable person would understand the words to mean under the circumstances. Where the terms of a contract are clear and unambiguous, we construe the contract according to its literal terms.

*Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶¶ 22–23, 326 Wis. 2d 300, 786 N.W.2d 15 (internal citations omitted).

[5] *Goodpaster v. Pfizer, Inc.*, 665 P.2d 414, 416 (Wash. 1983) describes its analysis of a similar promissory estoppel claim:

> [The plaintiff] premises his arguments on the assumption that [the defendant] had an implied obligation to pay the bonus in 1978. Before a promise to pay a bonus can be enforced, however, a real promise must exist. . . . *Action in reliance upon a supposed*

¶ 42. The circuit court granted the Parish's motion to dismiss on constitutional grounds, while seeming to conclude that the contract of employment was terminable at will and was based on an illusory promise.[6] The circuit court, in granting the motion to dismiss, referred to the constitutionally based ministerial employee test discussed in *Coulee Catholic Schools v. LIRC,* 2009 WI 88, 320 Wis. 2d 275, 768 N.W.2d 868, as well as the contract language reserving to the Parish the right to determine good cause for termination:

> It's admitted that the Catholic church['s] . . . mission is to propagate the faith and that [DeBruin's] particular job was to be the – again, Director of Faith Promotions [sic] so she fits into the two issues [relating to the organization's religious mission and the nature of the

---

*promise creates no obligation on a corporation whose promise is illusory. A supposed promise may be illusory because it is so indefinite that it cannot be enforced, or by reason of provisions contained in the promise which make its performance optional or entirely discretionary by the promisor.*

(emphasis added) (internal citations omitted).

[6] In preparing to grant the motion to dismiss, the circuit court stated:

But the Court does note that the contract called for gives the parish the right to terminate for cause only they — and they are the ones that can determine cause so in effect this makes this a contract at will, and therefore even if the Court were to make further inquiry it would appear that there was the right of the parish anyways but I don't think I get that far.

In attempting to sum up the argument of the parish, the circuit court commented:

So you're stating then that according to the Coulee case this Court cannot make any inquiry beyond those two steps as to the grounds for the termination or whether good cause was found or even if the contract is illusory because as you — as you recite the terms of the contract good cause is required for firing the teacher but it's up to the church to determine good cause. So that's illusory.

111

duties of the particular employee] and with that then the Court can't make further inquiry. But the Court does note that the contract called for gives the parish the right to terminate for cause only they – and they are the ones that can determine cause . . . and therefore even if the Court were to make further inquiry it would appear that there was the right of the parish anyways but I don't think I get that far.

Because we do not normally reach constitutional issues in cases that are resolvable on other grounds,[7] I would not reach the constitutional arguments that are raised by the Parish. For these reasons, as explained herein, I respectfully concur.

¶ 43. As the employer, the Parish, noted in its brief, leaving the determination of what constitutes good and sufficient cause for termination to the employer has the "practical effect" of nullifying the contractual limitation on the employer.[8] As noted previously, under the applicable principles of contract law and our precedent, this contract fails because it rests on an illusory promise. A Wisconsin case describes how an illusory promise, under application of contract law principles, leads to a conclusion that the contract fails for lack of consideration:

An illusory promise is a promise in form only: one that its maker can keep without subjecting him- or herself

---

[7] *Labor & Farm Party v. Elections Bd.,* 117 Wis. 2d 351, 354, 344 N.W.2d 177 (1984) ("This court does not normally decide constitutional questions if the case can be resolved on other grounds."). *See also Adams Outdoor Adver., Ltd. v. City of Madison,* 2006 WI 104, ¶ 91, 294 Wis. 2d 441, 717 N.W.2d 803; *In re Guardianship of James D.K.,* 2006 WI 68, ¶ 3 n.3, 291 Wis. 2d 333, 718 N.W.2d 38; and *Jensen v. Wisconsin Patients Comp. Fund,* 2001 WI 9, ¶ 16, 241 Wis. 2d 142, 621 N.W.2d 902.

[8] Br. of Resp't at 2 n.1.

to any detriment or restriction. An archetypal example of an illusory promise is the statement that "I promise to do as you ask if I please to do so when the time arrives." A promisor can keep that promise by either doing as the promisee asks or not, and so the promisor maintains total freedom to do as he or she wants. Since the maker of an illusory promise assumes no detriment or obligation, an illusory promise is not regarded as consideration. If a party to a purported contract has, in fact, made only illusory promises and therefore not constrained him- or herself in any way, he or she has given no consideration and therefore no contract exists. Because no contract exists, neither party has a cause of action for breach.

*Devine v. Notter,* 2008 WI App 87, ¶ 4, 312 Wis. 2d 521, 753 N.W.2d 557 (internal citations omitted).

¶ 44. In another Wisconsin case discussing illusory promises, *Gerruth Realty Co. v. Pire,* 17 Wis. 2d 89, 115 N.W.2d 557 (1962), this court concluded that the purported contract at issue was void for indefiniteness, a conclusion tantamount to a determination that the promise involved was illusory. In that case, we stated, "[A]ny interpretation, which allows one party to a contract to determine without limitation and in a subjective manner the meaning of an ambiguous term, comes dangerously close to an illusory or aleatory contract, if it does not in fact reach it." *Id.* at 92. While we are not dealing with an ambiguous term here, the result is the same—no enforceable contract.

¶ 45. These cases apply well-settled contract law principles. The treatises on contract law describe the concept of illusory promise in slightly different terms, but there is agreement on the essence of the concept. The writers of the treatise *Corbin on Contracts* describe such a "promise" as follows:

[A]n illusory promise is not a promise at all as that term has been herein defined. If the expression appears to have the form of a promise, this appearance is an illusion. . . . The fundamental element of a promise is a promisor's expression of intention that the promisor's future conduct shall be in accord with the present expression, irrespective of what the promisor's will may be when the time for performance arrives. In the supposed case [in which C promises to forbear from suing P as long as C wishes to forbear] [t]he clear meaning of the expression is that C's future conduct will be in accord with his or her own future will, *just as it would have been had nothing at all been said.*

1 Joseph M. Perillo, *Corbin on Contracts* § 1.17, at 47 (rev. ed. 1993) (emphasis added). Another well-regarded treatise, *Williston on Contracts,* puts it this way:

Where an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration. . . . In such cases, where the promisor may perform or not, solely on the condition of his whim, his promise will not serve as consideration. . . . [A] promise to employ as long as it suits the employer will not serve as consideration for the employee's return promise.

3 Richard A. Lord, *Williston on Contracts* § 7.7, at 111–12, 127–32 (4th ed. 2008). The Restatement of Contracts (Second) § 2, comment e, focuses on the lack of enforceability in an illusory promise:

*e. Illusory promises; mere statements of intention.* Words of promise which by their terms make performance entirely optional with the "promisor" whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise. . . . Even if a present intention is manifested, the reservation of an option to change that intention means

114

that there can be no promisee who is justified in an expectation of performance.

Restatement (Second) of Contracts § 2 (1981).

¶ 46. Courts have applied this principle in a variety of contexts, relying on the canon of construction under which courts give effect to the terms agreed upon by the parties to the contract. In a case that concerned a contract between an employer and an employee, the court examined a letter where the employer stated, "I propose to employ you to work for me for 15 months at my option." *Middleton v. Holecroft,* 270 S.W.2d 90, 93 (Mo. Ct. App. 1954). The court found that "[t]he plaintiff, by inserting the clause 'at my option,' reserved the right to give the defendant work if he saw fit and if he did not, there was no obligation on him to do so, and the defendant would be without remedy." *Id.* The court concluded, "In other words, the defendant could not have enforced the contract." *Id.* In a commercial breach of contract case, a Michigan federal district court held that where the terms exempted a party from liability for breach, the party's "promise to perform is, therefore, entirely illusory . . . ." *Commercial Movie Rental, Inc. v. Larry Eagle, Inc.,* 738 F. Supp. 227, 230–31 (W.D. Mich. 1989). The court then reasoned that "the entire contract is void for lack of consideration" and the defendant was entitled to judgment "because the contract it allegedly breached never existed." *Id.* at 231.

¶ 47. It is difficult to imagine a clause that more perfectly illustrates these principles than the one presented by the contract between the employee, DeBruin, and the employer, the Parish, in this case. This is made clear from the first document filed in this case, the complaint, in which DeBruin alleges that the Parish "terminated Ms. DeBruin's employ without good and

115

sufficient cause as that term is defined by the Contract of Employment." Compl., ¶ 5. There is, however, no separate clause in the contract that defines "good and sufficient cause" or, for that matter, any other term in the contract. The term "good and sufficient cause" is, by the terms of the contract, defined as having a meaning "which shall be determined by the Parish." In this case, the Parish's "promise" was no more than that its "future conduct will be in accord with [its] own future will, *just as it would have been had nothing at all been said." See* 1 Perillo, *Corbin on Contracts* § 1.17, at 47. For this reason, both of DeBruin's claims, breach of contract and promissory estoppel, which are based on an illusory promise, must fail.

¶ 48. In the purported contract at issue here the parties unambiguously reserved solely to the employer the right to determine what is just cause for termination. For that reason, I would affirm the circuit court's dismissal of the complaint, but on the grounds that the purported contract is based on an illusory promise which cannot serve as consideration for a contract, and therefore no enforceable contract exists. The Plaintiff's promissory estoppel claim fails for an almost identical reason: a promissory estoppel claim is based on a promise, and where there is nothing but an illusory promise, there is no basis for reliance.

¶ 49. The circuit court granted the Parish's motion to dismiss on constitutional grounds, while seeming to conclude that the contract of employment was terminable at will and was based on an illusory promise. The circuit court, in granting the motion to dismiss, referred to the constitutionally based ministerial employee test discussed in *Coulee* as well as the contract language reserving to the Parish the right to determine good cause for termination. Because we do not normally

reach constitutional issues in cases that are resolvable on other grounds, I would not reach the constitutional arguments that are raised by the Parish. For these reasons, as explained herein, I respectfully concur.

¶ 50. DAVID T. PROSSER, J. (*concurring*). This case implicates important issues in the delicate relationship between church and state. Recognizing this importance, the three other justices who have written in the case have made a valuable and good faith effort to resolve the present dispute. I write separately to provide some additional perspective.

I

¶ 51. Kathleen DeBruin (DeBruin) began her employment with the St. Patrick Congregation (St. Patrick) in Whitewater, Wisconsin, in 2002. On July 1, 2009, she and St. Patrick entered into a one-year Contract of Employment. DeBruin was slated to serve as Director of Faith Formation for St. Patrick. There is no dispute that DeBruin served a ministerial function in a religious organization.

¶ 52. Section 8 of the employment contract contained the following termination clause:

8. *Termination:*

A. The PARISH agrees that voluntary termination of this contract can be made by the mutual consent of both parties within thirty (30) days after written notice.

B. The PARISH agrees that the DIRECTOR OF FAITH FORMATION shall not be discharged during the term of this contract, without good and sufficient cause, which shall be determined by the PARISH. The PARISH agrees that the Pastor of the PARISH will be

117

responsible for giving the employee notice of any dissatisfaction with service or conduct. Dismissal may be immediate or within a time frame determined by the PARISH.

C. In the event that the DIRECTOR OF FAITH FORMATION is involuntarily terminated, if requested by the Pastor of the PARISH and agreed to by the DIRECTOR OF FAITH FORMATION, the DIRECTOR OF FAITH FORMATION shall continue to render services and be paid in accordance with the terms of this Agreement, for the period of time that services are provided.

¶ 53. On October 5, 2009, DeBruin was fired. On December 3, 2009, she filed suit in Walworth County Circuit Court, alleging that "St. Patrick terminated Ms. [DeBruin]'s employ without good and sufficient cause as that term is defined by" her contract. DeBruin sought damages for breach of contract or promissory estoppel. She did not seek reinstatement.

¶ 54. St. Patrick filed its answer on December 21, 2009. This answer included one affirmative defense not applicable here. On April 30, 2010, St. Patrick filed an amended answer including several additional affirmative defenses including: "As and for a second affirmative defense, the plaintiff may have failed to state a claim upon which relief can be granted. . . . As and for a third affirmative defense, the plaintiff's claims, if any, are barred by the Supreme Court decision in *Coulee Catholic Schools vs. LIRC,* 320 Wis. 2d 275 (2009)."

¶ 55. On July 21, 2010, St. Patrick filed a motion to dismiss DeBruin's complaint for failure to state a claim. In its brief, St. Patrick relied on the First Amendment to the United States Constitution and Article I, Section 18 of the Wisconsin Constitution, as

well as the language in the termination clause, to support its motion to dismiss.

¶ 56. DeBruin responded, arguing that contract claims are different from anti-discrimination suits brought by government entities and that the case could be decided on neutral principles of law, namely, whether DeBruin's alleged failure to perform background checks was "good and sufficient cause" for termination under her contract with St. Patrick.

¶ 57. As discussed by other writers, Walworth County Circuit Judge John R. Race held a hearing and granted the motion to dismiss. The circuit court identified several of the critical themes that emerge in this opinion.

¶ 58. After DeBruin appealed, the court of appeals certified the following question to this court: "In light of the Wisconsin Supreme Court's decision in *Coulee Catholic Schools v. LIRC,* 2009 WI 88, 320 Wis. 2d 275, 768 N.W.2d 868, are religious organizations immune from common law breach of contract lawsuits brought by ministerial employees?"

## II

¶ 59. The court of appeals certified a major constitutional question that is not susceptible to a yes or no answer. We need not address this question if the case can be decided on other grounds.

¶ 60. Kathleen DeBruin cannot win this case because she has not stated a claim that a Wisconsin court can decide in her favor.

¶ 61. First, her case comes to this court in the wake of *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,* 565 U.S. ___, 132 S. Ct. 694 (2012), and *Coulee Catholic Schools v. LIRC,* 2009 WI 88, 320

Wis. 2d 275, 768 N.W.2d 868. Although both cases involve the "ministerial exception" to government regulations affecting employment, both opinions contain compelling language that could be applied in a broader context.

¶ 62. The first paragraph of *Hosanna-Tabor* stated the issue in that case:

> Certain employment discrimination laws authorize employees who have been wrongfully terminated to sue their employers for reinstatement and damages. The question presented is whether the Establishment and Free Exercise Clauses of the First Amendment bar such an action when the employer is a religious group and the employee is one of the group's ministers.

132 S.Ct. at 699.

¶ 63. *Coulee* stated its question as "whether [the plaintiff's] age discrimination claim under the [Wisconsin Fair Employment Act] is precluded by the First Amendment and/or the Freedom of Conscience Clauses in Article I, Section 18 of the Wisconsin Constitution." *Coulee*, 320 Wis. 2d 275, ¶ 2.

¶ 64. The present case does not involve the "ministerial exception" *as discussed in Hosanna-Tabor and Coulee* because it does not feature an executive branch government agency attempting to enforce government employment discrimination laws or regulations. Instead, this case involves a "ministerial" employee of a religious organization attempting to enforce a private employment contract.

¶ 65. *Hosanna-Tabor* states that: "We express no view on whether the [ministerial] exception bars other types of suits, including *actions by employees alleging breach of contract* or tortious conduct by their religious

employers." *Hosanna-Tabor,* 132 S. Ct. at 710 (emphasis added). *Coulee,* in turn, said that "We do not mean to suggest that anything interfering with a religious organization is totally prohibited. *General laws* related to building licensing, taxes, social security, *and the like* are normally acceptable," 320 Wis. 2d 275, ¶ 65 (emphasis added), and it heavily relied on *Rayburn v. General Conference of Seventh-Day Adventists,* 772 F.2d 1164, 1171 (4th Cir. 1985), where the court said: "Like any other . . . organization [churches] may be held liable . . . *upon their valid contracts.*" (Emphasis added).

¶ 66. Thus, *Hosanna-Tabor* and *Coulee* do not explicitly bar a ministerial employee's suit to enforce an employment contract.

¶ 67. On the other hand, *Hosanna-Tabor* seemingly alluded to our certified question in its reference to "breach of contract," and both *Hosanna-Tabor* and *Coulee* contain some very broad language that would appear to cover a religious organization's hiring and termination of "ministerial" employees. In *Hosanna-Tabor,* the Court said:

> The members of a religious group put their faith in the hands of their ministers. *Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs.* By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Id.* at 706 (emphasis added).

The interest of society in the enforcement of employment discrimination statutes is undoubtedly important. But so too is the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission. When a minister who has been fired sues her church alleging that her termination was discriminatory, the First Amendment has struck the balance for us. The church must be free to choose those who will guide it on its way.

*Id.* at 710.

¶ 68. *Coulee* utilizes not only the First Amendment but also Article I, Section 18 of the Wisconsin Constitution:

This court has stated that Article I, Section 18 serves the same dual purposes as the Establishment Clause and Free Exercise Clause of the U.S. Constitution. However, we have also recognized that these provisions, though sharing some similarities with the federal provisions, are not the same. The protections and prohibitions in the Wisconsin Constitution are far more specific. And with regard to the rights of conscience, this clause contains extremely strong language, providing expansive protections for religious liberty. Thus, we are not limited to current First Amendment jurisprudence when interpreting our own constitutional protections for religious liberty; rather, we are required to give effect to the more explicit guarantees set forth in our state constitution.

*Coulee,* 320 Wis. 2d 275, ¶ 60 (citations omitted).

*The state simply has no authority to control or interfere with the selection of spiritual leaders of a religious organization with a religious mission.* The text of our constitution states that the state cannot do it—at all. The main inquiry is not how important the right in question is, but whether the law is "controlling" or "interfering with" religious freedom.

*Id.,* ¶ 63 (emphasis added).

122

The Wisconsin Constitution, with its specific and expansive language, provides much broader protections for religious liberty than the First Amendment. We need not explore the outer boundaries of those protections here. But it is clear that the Wisconsin Constitution provides at least the protections contained in the First Amendment.

*Id.,* ¶ 66.

¶ 69. Wisconsin courts are not executive branch agencies like the EEOC and LIRC, but that does not mean that they are not government entities engaging in "state action" when they enforce contracts. The Fourteenth Amendment "governs any action of a State, 'whether through its legislature, *through its courts,* or through its executive or administrative officers.' " *Mooney v. Holohan,* 294 U.S. 103, 113 (1935)(quoting *Carter v. Texas,* 177 U.S. 442, 447 (1900))(emphasis added).

¶ 70. Justice Roggensack's opinion cites *Shelley v. Kraemer,* 334 U.S. 1 (1948), for the proposition that "the action of state courts and judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment." Lead op., ¶ 17. *Shelley* was preceded in this respect by such cases as *Virginia v. Rives,* 100 U.S. 313, 318 (1879), and *Civil Rights Cases,* 109 U.S. 3, 17 (1883), and followed by *Palmore v. Sidoti,* 466 U.S. 429, 432 n.1 (1984). As in *Shelley,* judicial enforcement of a contract can constitute state action. *Cf. Gerber v. Longboat Harbour N. Condominium, Inc.,* 724 F. Supp. 884 (M.D. Fla. 1989)(vacated in part on other grounds *Gerber v. Longboat Harbour N. Condominium, Inc.,* 757 F.Supp. 1339 (M.D. Fla. 1991)).

¶ 71. At a minimum, *Hosanna-Tabor* and *Coulee* put Wisconsin courts on high alert when they are asked

to enforce a contract by a religious organization in a manner that the religious organization contends is a violation of its constitutional rights.

¶ 72. Second, the contract provision that DeBruin relies upon is illusory.

¶ 73. In Wisconsin, the employment-at-will doctrine is an established tenet of workplace relations. *Hausman v. St. Croix Care Ctr.*, 214 Wis. 2d 655, 663, 571 N.W.2d 393 (1997). It has been recognized in case law since 1871. *Prentiss v. Ledyard*, 28 Wis. 131, 133 (1871). In *Mackenzie v. Miller Brewing Co.*, 2001 WI 23, ¶ 12, 241 Wis. 2d 700, 623 N.W.2d 739, the court explained that the employment-at-will doctrine serves the interests of employees as well as employers. In *Batteries Plus, LLC v. Mohr*, 2001 WI 80, ¶ 15, 244 Wis. 2d 559, 628 N.W.2d 364, the court observed that "[t]he antidote for both parties to the potential unfairness arising from a party's change of heart is an employment contract."

¶ 74. Many employment contracts include a provision protecting an employee from discharge without cause. These provisions replace and reverse the employment-at-will rule.

¶ 75. In this case, the termination clause contains discharge "without cause" protection. However, it then nullifies that protection by assigning to St. Patrick the right to determine what "good and sufficient cause" is. In short, the protection that DeBruin relies on does not exist; it is illusory; and DeBruin is basically subject to employment-at-will.

¶ 76. In my view, much of Justice Crooks' opinion on this subject is spot on. He writes that the termination clause is "a textbook case of an illusory promise— 'words in promissory form that promise nothing.' " Justice Crooks' concurrence, ¶ 40 (quoting 2 Joseph M.

124

Perillo & Helen Hadjiyannakis Bender, *Corbin on Contracts* § 5.28, at 142 (1995)).

¶ 77. Justice Crooks cites the Restatement (Second) of Contracts § 2, comment e, which reads:

> (e) *Illusory promises; mere statements of intention.* Words of promise which by their terms make performance entirely optional with the "promisor" whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise. Even if a present intention is manifested, the reservation of an option to change that intention means that there can be no promisee who is justified in an expectation of performance.

Restatement (Second) of Contracts § 2 (1981).

¶ 78. My only difference with Justice Crooks' opinion is with his conclusion that because of the illusory "without cause" protection in the termination clause, "no contract exists," Justice Crooks' concurrence, ¶ 40, or "no enforceable contract exists," *Id.,* ¶¶ 41, 48. This difference, however, is fundamental. From St. Patrick's perspective, it did not breach the contract; it exercised its rights under the contract.

¶ 79. There may well be elements of the contract that could be enforced, but not the part of the termination clause that DeBruin relies on, because it afforded her no protection, as a matter of law.

¶ 80. Third, the termination clause does more than confirm St. Patrick's rights as an at-will employer with respect to at least some of its employees. It protects St. Patrick's rights as a religious organization. The termination clause as a whole specifically reserves to St. Patrick the right to freely exercise its religious prerogatives under the First Amendment and Article I, Section 18 of the Wisconsin Constitution.

¶ 81. DeBruin cannot prevail in this case because a religious organization reserved its rights to terminate its ministerial employees on grounds of "dissatisfaction," and it exercised those rights. To prevail, DeBruin would have to persuade a court to enter into an internal parish conflict and second guess the parish's decision. It would have to deny St. Patrick the power to make a decision that it explicitly reserved to itself. This cannot be squared with any reasonable view of religious liberty.

¶ 82. This conclusion is supported by this court's decision in *Olston v. Hallock,* 55 Wis. 2d 687, 201 N.W.2d 35 (1972), where the court reviewed the termination of an Episcopal Rector. Although the circumstances were different, the court observed:

> We think it is clear that the plaintiff is seeking a civil tribunal review of the merits of the findings and decisions of the Bishop and the Standing Committee, which determined that there was a serious disagreement existing between the pastor and the congregation as represented by its Wardens and Vestrymen, and that for the good of the church there must be an immediate dissolution of the pastoral relationship between St. Paul's and its pastor. *Under both Wisconsin and federal case law, such a review in this case is outside the province of judicial review.*

*Id.* at 698 (emphasis added).

¶ 83. This case is like *Olston* because authority inside the religious organization has been vested with the right to determine "good and sufficient cause." As such, this case is outside the province of judicial review.

¶ 84. For these reasons, DeBruin loses, and there is no point in extending her disappointment by remanding this case to the circuit court.

## III

¶ 85. St. Patrick carefully protected its religious prerogatives in the termination clause of the Contract of Employment. Suppose the clause read differently.

> The term of this Agreement shall begin July 1, 2009 and shall end on June 30, 2010. The PARISH agrees that the DIRECTOR OF FAITH FORMATION shall not be discharged during the term of this contract, without good and sufficient cause.

¶ 86. This hypothetical clause employs a standard devised by the parish, but it appears to open the door to interpretation by a court.

¶ 87. Suppose the contract provided:

> THIS AGREEMENT is made this first day of July, 2009 by and between Jane Doe, herein after referred to as the DIRECTOR OF FAITH FORMATION, and Saint Patrick Congregation of the Archdiocese of Milwaukee, herein after referred to as PARISH. The term of this Agreement shall begin July 1, 2009 and shall end on June 30, 2010.

¶ 88. This hypothetical clause contains no explicit "without cause" protection for the employee and no identified standard for a court to review. Could a Wisconsin court review a breach of contract claim under such a contract? If it did, what standards would it employ? How would it fill in the blanks?

¶ 89. Either of these hypothetical contract clauses would pose a much more difficult case than the one before us. We would no longer be able to say that the employee's discharge protection in the termination clause was illusory or that the clause specifically re-

served St. Patrick's religious rights. We would have to grapple with the question of whether by offering a contract, St. Patrick waived some of its religious protections.

¶ 90. These hypotheticals are not before us, and, in my view, it is both unnecessary and dangerous to attempt to determine now how these and other cases should be decided.

## IV

¶ 91. For more than a century, civil courts in the United States have cautiously approached questions involving churches and ministers. The Supreme Court approved the practice of courts abstaining from certain cases involving ecclesiastical questions, well-before the religion clauses of the First Amendment were incorporated into the Fourteenth Amendment and applied to the states. *E.g., Watson v. Jones,* 80 U.S. (13 Wall.) 679 (1872); *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in N. Am.,* 344 U.S. 94, 110 (1952). The Supreme Court has since indicated that the First Amendment is implicated in these disputes. *Kedroff,* 344 U.S. at 116.

¶ 92. The Supreme Court has recognized that matters of church polity, which includes the selection of ministers, generally receive First Amendment protection. *See Serbian E. Orthodox Diocese for the U.S. of Am. & Canada v. Milivojevich,* 426 U.S. 696, 713 (1976). *Cf. Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 16 (1929).

¶ 93. However, *Hosanna-Tabor* raises the question whether the First Amendment bars breach of contract claims involving the termination of a ministerial employee, or whether breach of contract claims are

128

subject to judicial review applying neutral principles of law. Article I, Section 18 of the Wisconsin Constitution must be considered in this determination. We also have to deal with Wisconsin precedent, which the parties did not cite. *Evangelical Lutheran St. Paul's Congregation v. Hass,* 177 Wis. 23, 187 N.W. 677 (1922)("Action by [church] . . . to compel . . . its pastor . . . to deliver up to it all property belonging to the organization . . . and perpetually enjoining him from . . . interfering with any of the property or functions of the congregation or of assuming or exercising the functions of its pastor."); *Olston,* 55 Wis. 2d at 690 (statement of the case) ("This appeal concerns the termination of Olston's pastoral relationship with St. Paul's Episcopal Church."); *Black v. St. Bernadette Congregation of Appleton,* 121 Wis. 2d 560, 360 N.W.2d 550 (Ct. App. 1984)(reviewing the disposition of a breach of contract claim brought against church where termination was made for ecclesiastical reason).

¶ 94. In recent years courts, often relying on *Rayburn,* 772 F.2d at 1171, have struggled to balance First Amendment concerns with attempts to enforce breach of contract claims involving a church and a minister by applying neutral principles of law, as suggested in *General Council on Finance & Administration of the United Methodist Church v. California Superior Court, County of San Diego,* 439 U.S. 1369, 1373 (1978)(Rehnquist, Circuit Justice), and *Jones v. Wolf,* 443 U.S. 595, 602–03 (1979).[1]

---

[1] *See e.g., Petruska v. Gannon Univ.,* 462 F.3d 294, 312 (3d Cir. 2006)("Therefore, the question is whether Petruska's breach of contract claim can be decided without wading into doctrinal waters. . . . [If] issues which would result in excessive entanglement [arise], the claims may be dismissed on that basis on summary judgment.")(citation omitted); *Minker v. Baltimore*

¶ 95. In *Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354 (D.C. Cir. 1990), the court permitted a contract claim to proceed but it repeatedly raised caution in doing so. After dismissing one of the contract claims brought by Pastor Minker against his church based on documents drafted by the church, the court permitted a second claim to survive a motion to dismiss, while providing the following warnings:

> It is true, as the Supreme Court noted in another context, courts may not consider provisions whose enforcement would require "a searching and therefore impermissible inquiry" into church doctrine. *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 723 (1976).
>
> . . . .
>
> The *Rayburn* court held that entanglements might result from a protracted legal procedure which might involve subpoenas, discovery, and other tools designed to probe the mind of the church. 772 F.2d at 1170–71. The Church asserts that simply permitting a court to hear Minker's contract claims might distort church

*Annual Conference of United Methodist Church,* 894 F.2d 1354 (D.C. Cir. 1990); *Marshall v. Munro,* 845 P.2d 424, 428 (Alaska 1993)(Courts must dismiss claims that require "the court to interpret [the minister's] employment relationship" with his church.); *Dayner v. Archdiocese of Hartford,* 23 A.3d 1192, 1205 (Conn. 2011) (Courts can hear cases involving "particular wrongs by the church that are *wholly [nonreligious] in character.*") (quoting *Rweyemamu v. Cote,* 520 F.3d 198, 208 (2d Cir. 2008)) (emphasis added by *Dayner*); *Alicea v. New Brunswick Theological Seminary,* 608 A.2d 218, 222 (N.J. 1992)("[W]e refuse to adopt a *per se* rule that courts may not entertain" suits by ministers against churches. However, "there are many cases in which court intervention is simply inappropriate" under the First Amendment.) (citations and quotations omitted).

appointment decisions—causing churches to make only those choices that avoid the appearance of legal impropriety.

We acknowledge that the contract alleged by Minker threatens to touch the core of the rights protected by the free exercise clause. *See McClure v. Salvation Army,* 460 F.2d 553, 558–59 (5th Cir. 1972) ("The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose."). We also agree that any inquiry into the Church's reasons for asserting that Minker was not suited for a particular pastorship would constitute an excessive entanglement in its affairs. *See Natal v. Christian and Missionary Alliance,* 878 F.2d 1575 (1st Cir. 1989)(inquiry into reasons for minister's discharge would plunge court "into a maelstrom of Church policy, administration, and governance"); *Rayburn,* 772 F.2d at 1171.

. . . .

Furthermore, as the remedy would be limited to the award of money damages, we see no potential for distortion of church appointment decisions from requiring that the Church not make empty, misleading promises to its clergy.

It could turn out that in attempting to prove his case, appellant will be forced to inquire into matters of ecclesiastical policy even as to his contract claim. Of course, in that situation, a court may grant summary judgment on the ground that appellant has not proved his case and pursuing the matter further would create an excessive entanglement with religion. . . . Once evidence is offered, the district court will be in a position to control the case so as to protect against any impermissible entanglements. Thus, while the first amendment forecloses any inquiry into the Church's assessment of Minker's suitability for a pastorship, even for

131

the purpose of showing it to be pretextual, it does not prevent the district court from determining whether the contract alleged by Minker in fact exists. *Catholic High School Ass'n v. Culvert,* 753 F.2d 1161, 1168 (2d Cir. 1985) (first amendment prohibition of state board's ability to inquire into nature of religious motives does not preclude it from asserting jurisdiction).

*Minker,* 894 F.2d at 1359–61.

## V

¶ 96. In my view, this court should not try to decide controversies that are not before us. Consequently, I join the mandate to dismiss the case, which amounts to an affirmance of the *circuit court.*

¶ 97. For the foregoing reasons, I respectfully concur.

¶ 98. ANN WALSH BRADLEY, J. *(dissenting).* There is no majority opinion of this court. Of the five justices who would affirm the circuit court, three (Justice Roggensack, Justice Ziegler, and Justice Gableman) would decide this case on the constitution[1] and two (Justice Crooks and Justice Prosser) would decide it on the specific contract at issue in this case. Accordingly, because no opinion has garnered the vote of four justices, nothing set forth in any of the opinions has precedential value.

¶ 99. When I examine the issue certified by the court of appeals, I conclude that DeBruin's common law contract claims do not implicate free exercise concerns and therefore do not require dismissal for failure to state a claim. Further, it would be premature to determine whether the claims would foster an excessive state

---

[1] Hereinafter, Justice Roggensack's opinion.

entanglement with religion. Because I would remand this case to the circuit court for further proceedings, I respectfully dissent.

I

¶ 100. The court of appeals certified the case to this court, asking the following question: "In light of the Wisconsin Supreme Court's decision in *Coulee Catholic Schools v. LIRC,* 2009 WI 88, 320 Wis. 2d 275, 768 N.W.2d 868, are religious organizations immune from common law breach of contract lawsuits brought by ministerial employees?" *Coulee* and other relevant cases address state involvement in a church's decision to hire or fire its ministers. These cases do not address state involvement with other aspects of the employment relationship. Accordingly, I conclude that a narrower question should be addressed: whether, based on the reasoning of *Coulee* and similar cases, a religious organization is immune from common law contract claims challenging its basis for terminating a ministerial employee.

¶ 101. St. Patrick contends that DeBruin failed to state a claim for relief because her contract claims are precluded by the state and federal constitutions. The First Amendment of the United States Constitution provides, in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." These two clauses provide distinct protections.

¶ 102. The first clause, "Congress shall make no law respecting an establishment of religion," is referred to as the Establishment Clause. It affords protection against "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Lemon*

*v. Kurtzman,* 403 U.S. 602, 612 (1971); *see also State ex rel. Wisconsin Health Facilities Auth. v. Lindner,* 91 Wis. 2d 145, 280 N.W.2d 773 (1979). An "excessive entanglement" in violation of the Establishment Clause can arise when the state is required to interpret and evaluate church doctrine. *See, e.g., Wisconsin Conference Bd. of Trustees of United Methodist Church, Inc. v. Culver,* 2000 WI App 132, ¶ 15, 237 Wis. 2d 343, 614 N.W.2d 523.

¶ 103. The second clause, which declares that "Congress shall make no law . . . prohibiting the free exercise thereof," is referred to as the Free Exercise Clause. It protects the power of religious organizations "to decide for themselves, free from state interference, matters of church governance as well as those of faith and doctrine." *Coulee,* 320 Wis. 2d 275, ¶ 37.

¶ 104. Additionally, Article I, Section 18 of the Wisconsin Constitution provides, in relevant part, "The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; . . . nor shall any control of, or interference with, the rights of conscience be permitted . . . ." This court has explained that this provision, referred to as the Freedom of Conscience Clause, "serve[s] the same dual purpose of prohibiting the 'establishment' of religion and protecting the 'free exercise' of religion." *State ex rel. Warren v. Nusbaum,* 55 Wis. 2d 316, 332, 198 N.W.2d 650 (1972). Nevertheless, it contains more explicit language than the First Amendment of the United States Constitution, providing expansive protections for religious liberty. *Coulee,* 320 Wis. 2d 275, ¶ 60.

¶ 105. The parties' arguments focus on the Free Exercise Clause and the Freedom of Conscience Clause. Accordingly, I address the constitutional right to free exercise first. Then, I turn to briefly comment upon the

Establishment Clause concerns that could potentially be implicated by DeBruin's contract claims.

A

¶ 106. St. Patrick asserts that state court adjudication of DeBruin's contract claims would violate its right to free exercise. Based on this court's reasoning in *Coulee* and the United States Supreme Court's reasoning in *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. __, 132 S. Ct. 694 (2012), St. Patrick contends that DeBruin cannot challenge her termination because "[i]t is now crystal clear that the legal analysis of the hiring/firing decisions of religious organizations begins and ends with the question of whether . . . [the] employee was a ministerial employee."

¶ 107. The cases upon which St. Patrick relies do not involve court enforcement of a contractual promise that was voluntarily made by a church. Rather, they involve challenges to claims filed under state and federal anti-discrimination statutes.

¶ 108. In these cases, courts have been called upon to address employment discrimination claims made against religious organizations, and they have drawn a line between ministerial and non-ministerial employees. The court-created "ministerial exception" is an affirmative defense available to religious organizations that precludes discrimination claims filed by their ministerial employees.

¶ 109. In *Coulee*, 320 Wis. 2d 275, ¶ 23, a ministerial employee of a religious school alleged that she was terminated on the basis of age, in violation of the Wisconsin Fair Employment Act. This court characterized the employee's suit as "an effort by the state to

intrude into the hiring and firing decisions of a religious organization," and it concluded that such an effort violated both the Free Exercise Clause and the Freedom of Conscience Clause. *Id.*, ¶ 62. Regarding the Freedom of Conscience Clause, it explained: "The state simply has no authority to control or interfere with the selection of spiritual leaders of a religious organization with a religious mission." *Id.*, ¶ 88.

¶ 110. The *Coulee* decision relies heavily on an earlier case from the Fourth Circuit Court of Appeals. In *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985), an employee argued that she had been passed over to fill a ministerial position on the basis of race and sex, and that the church's discriminatory hiring decision violated Title VII of the Civil Rights Act of 1964. The Fourth Circuit concluded that the "introduction of government standards to the selection of spiritual leaders would significantly, and perniciously, rearrange the relationship between church and state," and that "[a]ny attempt by government to restrict a church's free choice of its leaders . . . constitutes a burden on the church's free exercise rights." *Id.* at 1169, 1168.

¶ 111. Finally, in *Hosanna-Tabor*, 132 S. Ct. 694, a ministerial employee of a religious school alleged that she had been terminated because of a disability in violation of the Americans with Disabilities Act. The question before the United States Supreme Court was "whether [the] freedom of a religious organization to select its ministers is implicated by a suit alleging discrimination in employment." *Id.* at 705. The Court recognized the ministerial exception and explained that "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision.

136

Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." *Id.* at 706.[2]

¶ 112. Not one of these cases involved a contract claim brought by a ministerial employee. To the contrary, all three cases either imply or state outright that their reasoning, which is applicable to claims made under anti-discrimination statutes, does not necessarily extend to claims for breach of contract.

¶ 113. In *Coulee,* this court acknowledged that "a church's [constitutional] authority to make hiring and firing decisions . . . remove[s] the church's decisions in these matters from the jurisdiction of the courts *with respect to anti-discrimination laws*[.]"[3] 320 Wis. 2d 275, ¶ 40 (emphasis added). Nevertheless, it cautioned, "We do not mean to suggest that anything interfering with a religious organization is totally prohibited. General laws related to building licensing, taxes, social security, and the like are normally acceptable." *Id.,* ¶ 65.

---

[2] *See also Combs v. Central Tex. Annual Conf. of United Methodist Church,* 173 F.3d 343, 350 (5th Cir. 1999) (holding that the free exercise clause prohibited application of Title VII to a church's decision to terminate a minister) ("[I]n investigating *employment discrimination claims* by ministers against their church, secular authorities would necessarily intrude into church governance in a manner that would be inherently coercive, even if the alleged discrimination were purely nondoctrinal.") (emphasis added).

[3] The United States Supreme Court later clarified that the ministerial exception operates not as a jurisdictional bar, but rather, as an affirmative defense to an otherwise cognizable claim. *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,* 132 S. Ct. 694, 709 n.4 (2012).

137

¶ 114. In *Rayburn,* upon which the *Coulee* court relied, the Fourth Circuit was more specific with regard to the question we now address. It expressly stated that its analysis would not extend to breach of contract claims: "Of course churches are not—and should not be—above the law. *Like any other person or organization, they may be held liable* for their torts and *upon their valid contracts.*" 772 F.2d at 1171 (emphasis added).

¶ 115. Most recently, in *Hosanna-Tabor,* the Supreme Court clearly stated that it "express[ed] no view" on whether its analysis would apply to a breach of contract claim brought against a church by a ministerial employee:

> The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial exception bars such a suit. We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers. There will be time enough to address the applicability of the exception to other circumstances if and when they arise.

132 S. Ct. at 710.

¶ 116. I take these courts at their word. DeBruin's contract claims are not precluded by a straightforward application of *Coulee, Rayburn,* or *Hosanna-Tabor.*

¶ 117. Nevertheless, St. Patrick asks the court to break new ground and extend the holdings of these cases to DeBruin's contract claims. It argues that "the underpinnings and rationale for why the discrimination laws" cannot restrict a church's decision to terminate a ministerial employee "apply with equal force" to a contract claim. The implication of this argument is

138

that, for the same reason the legislature cannot regulate a church's decision to terminate a minister, courts must likewise refrain from adjudicating claims alleging that the church breached terms of an employment contract by terminating a ministerial employee.

¶ 118. I disagree with St. Patrick that the underpinnings and rationale of *Coulee, Rayburn,* and *Hosanna-Tabor* apply with equal force to DeBruin's contract claims. The concern underlying these cases is that the enforcement of anti-discrimination laws would "intrud[e] into the mission of religious organizations"[4] by introducing "government standards to the selection of spiritual leaders,"[5] "restrict[ing] a church's free choice of its leaders,"[6] and "depriving the church of control over the selection of those who will personify its beliefs."[7] There are crucial differences between the enforcement of an anti-discrimination statute and the enforcement of a contract, and these differences undermine St. Patrick's concerns about state intrusion into its free choice of ministerial employees.

¶ 119. Here, DeBruin's claims do not raise concerns about state "regulat[ion of] the hiring and firing" of ministerial employees, *Coulee,* 320 Wis. 2d 275, ¶ 84, because the relevant law (contract law) is not a regulatory mandate from the state. The state played no role in St. Patrick's selection of a minister. It did not require St. Patrick to enter into a written employment contract, and it did not mandate any specific contract terms.

---

[4] *Coulee Catholic Schools v. LIRC,* 2009 WI 88, ¶ 55, 320 Wis. 2d 275, 768 N.W.2d 868.

[5] *Rayburn v. General Conference of Seventh-Day Adventists,* 772 F.2d 1164, 1169 (4th Cir. 1985).

[6] *Id.* at 1168.

[7] *Hosanna-Tabor,* 132 S. Ct. at 706.

¶ 120. Instead, St. Patrick voluntarily selected its minister, freely negotiated the terms of employment including the circumstances under which the minister could be fired, and willingly agreed that both parties would be bound by those terms. Allowing DeBruin's contract claims to survive a motion to dismiss would merely recognize that St. Patrick, "like any other person or organization," is bound by its contracts. *Rayburn,* 772 F.2d at 1171. Given that this case does not involve the state attempting to restrict the church's choice of its leaders, I conclude that this case does not implicate the Free Exercise Clause of the United States Constitution.

¶ 121. My conclusion is supported by decisions from other jurisdictions. In *Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354 (D.C. Cir. 1990), the court determined that permitting a pastor's Age Discrimination in Employment Act claim to proceed would violate the Free Exercise Clause. Nevertheless, the court found "compelling" the assertion that the Free Exercise Clause could not bar an action for a breach of an employment contract, *id.* at 1359, and it held that dismissal of the breach of contract claim was premature, *id.* at 1361. It explained: "A church is always free to burden its activities voluntarily through contracts," and further that "[a] church, like any other employer, is bound to perform its promissory obligations in accord with contract law." *Id.* at 1359, 1361. Accordingly, the pastor was "entitled to rely upon his employer's representations and to enforce them in a secular court." *Id.* at 1361.

¶ 122. Similarly, in *Petruska v. Gannon University,* the court determined that even though a minister's Title VII discrimination claim must be dismissed, the "[e]nforcement of a promise, willingly made and supported by consideration, in no way constitutes a state-

imposed limit upon a church's free exercise rights." 462 F.3d 294, 310 (3d Cir. 2006). The Third Circuit Court of Appeals explained: "On its face, application of state contract law does not involve government-imposed limits on [the church's] right to select its ministers: Unlike the duties under Title VII and state tort law, contractual obligations are entirely voluntary." *Id.*

¶ 123. For the same reason, I conclude that permitting DeBruin to maintain contract claims does not control or interfere with St. Patrick's right of conscience in violation of the Wisconsin Constitution. I acknowledge that the Wisconsin Constitution provides broader free exercise protection than the First Amendment. Nevertheless, as explained above, court adjudication of the claims does not "control or interfere with" a church's selection of its ministers. *See, Coulee,* 320 Wis. 2d 275, ¶ 63.

¶ 124. Instead, if courts routinely dismissed this variety of contract claim, they might create an unnecessary roadblock hampering a church's free exercise ability to select its ministers. There is no dispute that a church, like any other organization, enjoys the freedom to contract. Contract law "promote[s] and facilitate[s] the reliance on agreements" through court enforcement of "reasonable expectations that have been induced by the making of a promise." Joseph M. Perillo, *Corbin on Contracts* § 1.1 at 2 (rev. ed. 1993).[8] The underpinning

---

[8] An 1875 statement by Sir George Jessel, which has been described as "perhaps the most famous judicial statement about freedom of contract," identifies contract enforcement as a key component of the freedom of contract: "[M]en of full age and competent understanding shall have the utmost liberty of contracting, and [] their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice." Todd D. Rakoff, *Is Freedom From Contract Neces-*

141

of contract law is that competent parties are permitted to bind themselves to voluntary agreements, and such agreements will be enforced by courts (provided that they are not illegal or contrary to public policy). *See, e.g., Jezeski v. Jezeski,* 2009 WI App 8, ¶ 11, 316 Wis. 2d 178, 763 N.W.2d 176.

¶ 125. If the ministerial exception discussed in *Coulee, Rayburn,* and *Hosanna-Tabor* were extended to bar contract claims, then termination clauses would not be worth the paper they were printed on because no civil authority could hold a religious organization to the terms of any such contract it had negotiated with a ministerial employee. Candidates for ministerial positions might be less inclined to enter into these types of employment arrangements in the first instance. A church's ability to recruit the best and brightest candidates for ministerial positions could be undermined because the church would be unable to offer desirable candidates any contractual assurances regarding job security.[9]

---

*sarily a Libertarian Freedom?,* 2004 Wis. L. Rev. 477, 479–80 (quoting *Printing & Numerical Registering Co. v. Sampson,* 19 L.R.-Eq. 462, 465 (V.C. 1875)); *see also* Harry N. Scheiber, *The State and Freedom of Contract* 1 (1998) (defining the "institution of contract" as "the legal form in which agreements and promises are made, with the purpose of making them enforceable by the courts").

[9] At oral argument, St. Patrick acknowledged that its position was "absolute" and that, "if push comes to shove, . . . the First Amendment, it trumps the right to contract . . . ." It could not identify any contractual assurances that a church could offer a prospective ministerial employee regarding job security. Instead, it could only offer the following advice: "I would make sure that [a prospective ministerial employee] is very comfortable with the people that she wants to work for. That would the

¶ 126. I conclude that DeBruin's contract claims should not be dismissed for failure to state a claim. Rather, they should be remanded to the circuit court for further proceedings.

B

¶ 127. I have determined that DeBruin's contract claims do not raise free exercise concerns. Nevertheless, I pause to observe that another constitutional concern, excessive entanglement in violation of the Establishment Clause, could potentially arise if the court proceeded to evaluate St. Patrick's reasons for terminating DeBruin. *See Lemon v. Kurtzman,* 403 U.S. 602 (1971); *State ex rel. Wisconsin Health Facilities Auth. v. Lindner,* 91 Wis. 2d 145, 280 N.W.2d 773 (1979).

¶ 128. In Establishment Clause cases, the question is whether the court is interfering with "inherently religious matters." Carl H. Esbeck, *Religion and the First Amendment: Some Causes of the Recent Confusion,* 42 Wm. & Mary L. Rev. 883, 915 (2001). "[G]overnment does not exceed the restraints of the Establishment Clause unless it is acting on, or intruding into, such matters or topics." *Id.*

¶ 129. As stated above, in both *Minker* and *Petruska,* the court refused to dismiss a minister's contract claim under the Free Exercise Clause for failure to state a claim. Nevertheless, both courts cautioned that adjudicating the cases might require court evaluation of the validity of religious doctrine, and both courts speculated that concerns of "excessive entanglement" with religion might ultimately require dismissal of the case on summary judgment.

---

first thing. You would have to meet the people and be very comfortable with your employer."

143

¶ 130. In *Minker*, 894 F.2d at 1360, the court explained the potential for entanglement as follows: "It could turn out that in attempting to prove his case, [Minker] will be forced to inquire into matters of ecclesiastical policy even as to his contract claim. Of course, in that situation, a court may grant summary judgment on the ground that [Minker] has not proved his case and pursuing the matter further would create an excessive entanglement with religion."

¶ 131. Similarly, in *Petruska*, 462 F.3d at 312, the court reasoned that maintaining the claim could, but would not necessarily, foster entanglement: "Resolution of this claim does not turn on an ecclesiastical inquiry —or, at least not at the outset. If [the Church's] response to Petruska's allegations raise issues which would result in excessive entanglement, the claims may be dismissed on that basis on summary judgment."

¶ 132. As the above cases forewarn, it is possible that facts would come to light which would require the circuit court to "wade[] into doctrinal waters" and make determinations about "matters of ecclesiastical policy." *See Petruska,* 462 F.3d at 312; *Minker,* 894 F.2d at 1360.[10] If so, the circuit court could be presented with an argument that summary judgment should be granted because pursuing the matter further would create an excessive entanglement with religion.

¶ 133. At this point, however, the case is before this court on a motion to dismiss for failure to state a

---

[10] *See also Black v. St. Bernadette Congregation of Appleton,* 121 Wis. 2d 560, 564, 360 N.W.2d 550 (Ct. App. 1984) (Wisconsin courts may not "review the merits of a termination [of a minister] based on ecclesiastical reasons" but "[t]he determination of whether an ecclesiastical question exists must be made by the court.") (citing *Olston v. Hallock,* 55 Wis. 2d 687, 698, 201 N.W.2d 35 (1972); *Wisconsin v. Yoder,* 406 U.S. 205 (1972)).

claim, and there is nothing in the record about why DeBruin was terminated or whether that decision involved any matters of faith and ministry. Any concerns about excessive entanglement would be "speculative," and dismissing DeBruin's claim on this basis would be "premature." *See Minker,* 894 F.2d at 1360. The circuit court would be well situated to address any entanglement concerns if the parties were given the opportunity to develop the factual record on remand.

## II

¶ 134. Justice Roggensack offers a different interpretation of the constitutional provisions at issue here. Unfortunately, this interpretation paints with too broad a brush, is too absolute, and reaches far beyond contracts governing the termination of ministerial employees. The opinion is flawed in three key respects.

¶ 135. First, it conflates the principles underlying the Free Exercise Clause and the principles underlying the Establishment Clause. It makes no distinction between the two. Instead, it borrows freely from free exercise principles and establishment principles alike.

¶ 136. For example, Justice Roggensack's sweeping statement about the meaning of the First Amendment is based on her assessment of *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich,* 426 U.S. 696 (1976). The opinion summarizes that case as follows: "[C]hurch decisions in matters of faith and ministry are so fundamental to the free exercise of religious liberty that civil courts are prohibited from delving into the reasons for religion-based decisions." Justice Roggensack's opinion, ¶ 20. The opinion fails to acknowledge that the Court's analysis in *Serbian Eastern Orthodox Diocese* provides

145

a classic example of the concern, rooted in Establish-
ment Clause jurisprudence, about the entanglements
that arise when a civil court is called upon to interpret
church doctrine to resolve a case.[11]

---

[11] A plethora of scholars of the First Amendment and
church-state relations identify *Serbian Eastern Orthodox Dio-
cese* as a classic Establishment Clause case, even though the
opinion's First Amendment analysis did not specifically identify
the separate clauses. An examination of the opinion reveals that
the Court's analysis was based on the Establishment Clause
principle of entanglement. *See, e.g.,* Carl H. Esbeck, *The Estab-
lishment Clause as a Structural Restraint on Governmental
Power,* 84 Iowa L. Rev. 1, 58 (1998) ("In cases such as *Kedroff*
and *[Serbian Eastern Orthodox Diocese],* the Establishment
Clause kept the prerogatives vested in religion from being
undermined by the government's interference with a church's
affairs."); Steven K. Green, *Religious Discrimination, Public
Funding, and Constitutional Values,* 30 Hastings Const. L.Q. 1,
17, 17 n.79 (Fall 2002) (citing *Serbian Eastern Orthodox Diocese*
as an example of the "concern" that "the State will become
entangled in essentially religious controversies"); Constance
Frisby Fain, *Minimizing Liability for Church-Related Counsel-
ing Services: Clergy Malpractice and First Amendment Religion
Clauses,* 44 Akron L. Rev. 221, 244 n.161 (2011) (citing *Serbian
Eastern Orthodox Diocese* near the top of a list "of cases that
have addressed or applied the 'excessive entanglement' test
[from *Lemon*] or the Establishment Clause in general"); Carl H.
Esbeck, *Religion and the First Amendment: Some Causes of the
Recent Confusion,* 42 Wm. & Mary L. Rev. 883, 916 n.106 (2001)
(citing *Serbian Eastern Orthodox Diocese* for the proposition
that "courts are without competence to adjudicate essentially
doctrinal disputes for, inter alia, avoidance of entanglement");
Carl H. Esbeck, *Myths, Miscues, and Misconceptions: No-Aid
Separationism and the Establishment Clause,* 13 Notre Dame J.
L. Ethics & Pub. Pol'y 285, 305–06 & n.61 (1999) (citing *Serbian
Eastern Orthodox Diocese* at the top of the list of cases demon-
strating that "the Court has deemed the entanglement excessive
when the regulation intrudes on inherently religious matters");

¶ 137. In *Serbian Eastern Orthodox Diocese,* Milivojevich, a defrocked bishop, brought a lawsuit in civil court against his former employer, the Mother Church. He alleged that his defrocking had to be set aside as "arbitrary" because the proceedings against him had not been conducted in accordance with the Church's constitution and penal code.[12] The Supreme Court of Illinois rendered its own interpretation of the Church's constitution and penal code, and it concluded that Milivojevich's defrocking was invalid because the Mother Church has not followed its own laws and procedures. 426 U.S. at 712–13.

¶ 138. The United States Supreme Court explained that "the First and Fourteenth Amendments

---

Steven K. Green, *Of (Un)equal Jurisprudential Pedigree: Rectifying the Imbalance Between Neutrality and Separationism,* 43 B.C. L. Rev. 1111, 1122 (2002); David K. DeWolf, *State Action Under the Religion Clauses: Neutral in Result or Neutral in Treatment?,* 24 U. Rich. L. Rev. 253, 269 (1990).

Contrary to Justice Roggensack's assertion, the *Minker* case supports my conclusion that *Serbian Eastern Orthodox Diocese* is based on the Establishment Clause principle of entanglement. The *Minker* court cites *Serbian Eastern Orthodox Diocese* for the proposition that "courts may not consider provisions whose enforcement would require 'a searching and therefore impermissible inquiry' into church doctrine." *Minker v. Baltimore Area Annual Conference of United Methodist Church,* 894 F.2d 1354, 1360 (D.C. Cir. 1990).

[12] The Mother Church was "governed according to the Holy Scriptures, Holy Tradition, Rules of the Ecumenical Councils, the Holy Apostles, the Holy Faiths of the Church, the Mother Church Constitution adopted in 1931, and a 'penal code' adopted in 1961." *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich,* 426 U.S. 696, 699 (1976). The United States Supreme Court observed that "[t]hese sources of law are sometimes ambiguous and seemingly inconsistent." *Id.*

147

permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government," *id.* at 724, and that civil courts are bound to accept the Church's decisions "on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law," *id.* at 713. "To permit civil courts to probe deeply enough into the allocation of power within a hierarchical church so as to decide religious law," the Court held, "would violate the First Amendment in much the same manner as civil determination of religious doctrine." *Id.* at 709. The Court reversed out of concern that "the State will become entangled in essentially religious controversies." *Id.* at 709.

¶ 139. By resting her opinion in part on entanglement principles borrowed from *Serbian Eastern Orthodox Diocese,*[13] Justice Roggensack decides an issue not before the court—the application of the Establishment Clause in this case. St. Patrick's motion to dismiss was not based upon the Establishment Clause or any concern about excessive entanglement. Instead, it was based on the Free Exercise Clause and the Freedom of Conscience Clause of the Wisconsin Constitution.

¶ 140. Likewise, the circuit court's decision, the court of appeals' certification, and St. Patrick's argument do not present an Establishment Clause issue. When it dismissed DeBruin's claim, the circuit court ruled that it was precluded by *Coulee* (a Free Exercise Clause and Freedom of Conscience Clause case) from addressing DeBruin's contract claims. The court of appeals certified the case to this court, asking the

---

[13] Additionally, the opinion finds support in the *Petruska* court's discussion of "ecclesiastical inquiry" without acknowledging that this portion of the *Petruska* opinion addressed the Establishment Clause and concerns about the potential for entanglement. Justice Roggensack's opinion, ¶ 29.

following constitutional question: "In light of the Wisconsin Supreme Court's decision in *Coulee* ... , are religious organizations immune from common law breach of contract lawsuits brought by ministerial employees?"

¶ 141. During St. Patrick's briefing in this court, it stridently asserted that the Establishment Clause principle of excessive entanglement had nothing to do with the controversy, and that it did not matter whether its reason for terminating DeBruin was religious or secular. It explained:

> Ms. DeBruin attempts to avoid the *Coulee* decision by basing her argument on an analysis of federal court cases that mainly interpret the application of the 'Establishment Clause' of the First Amendment of the U.S. Constitution and its 'excessive entanglement' test. . . .
>
> Ms. DeBruin's analysis of the reason for her firing is not relevant to St. Patrick's Motion to Dismiss. As explained above, the Court in *Coulee* held that the "Freedom of Conscience Clauses" or the "Free Exercise Clause" should apply to the hiring and firing decisions of a religious organization. This analysis is based on the two prong test [set forth in *Coulee*]. . . . Ms. DeBruin's entire 'excessive entanglement' analysis is not on point to this case.

¶ 142. Justice Roggensack's opinion should not conflate free exercise and establishment principles, particularly when St. Patrick has rejected the Establishment Clause as a basis for its claim and has declined to brief the issue. In so doing, the opinion confuses the interests that are protected by these two clauses, as well as the analyses that are conducted under these two clauses.

¶ 143. The second flaw in Justice Roggensack's opinion is that it unreasonably presumes that all deci-

149

sions to terminate a ministerial employee will implicate "religious controversies" regarding "matters of faith and ministry." Justice Roggensack's opinion, ¶ 20. It asserts, without reservation: "[I]nquiry into the validity of a religious institution's reasons for the firing of a ministerial employee *will involve consideration of ecclesiastical decision-making.*" *Id.*, ¶ 29 (emphasis added).

¶ 144. Yet, many decisions to terminate a ministerial employee are likely to be much more mundane. In this very case, there is not at this point any allegation that DeBruin was terminated for an ecclesiastical or religious reason.

¶ 145. In making its unsubstantiated assumption that all contract claims by ministers challenging their termination will involve entanglement in "matters of faith and ministry," Justice Roggensack's opinion overlooks *Minker* and *Petruska,* two cases that are directly on point. Both cases thoroughly discuss the differences between statutory discrimination claims and contract claims and provide a reasoned explanation for why a contract claim would not violate the Free Exercise Clause but might ultimately implicate Establishment Clause concerns.[14] *Minker,* 894 F.2d at 1359–61; *Petruska,* 462 F.3d at 310–11. Both cases explain that speculating on a motion to dismiss whether entanglements will arise is premature. *Minker,* 894 F.2d at 1360; *Petruska,* 462 F.3d at 311–12. Both cases state that a determination about entanglement will depend upon the facts and allegations of the specific case, and that

---

[14] By contrast, Justice Roggensack's opinion glosses over any distinction between statutory discrimination claims and contract claims with the conclusory assertion that "beginning with a contract analysis would cause a court to diminish the priority given to the policies that drive the First Amendment and would lead a court to err." Justice Roggensack's opinion, ¶ 26.

the case can be dismissed on summary judgment if and when entanglements arise.[15]

¶ 146. Third, Justice Roggensack's opinion makes sweeping pronouncements that could extend far beyond the confines of this case. These pronouncements are too absolute because they would preclude the enforcement of a mutually agreed upon contract. Further, if adopted by a majority of the court, they could have implications for a church's ability to contract in other settings.

¶ 147. The opinion proclaims that "church decisions in matters of faith and ministry are so fundamental to the free exercise of religious liberty that civil courts are prohibited from delving into the reasons for religion-based decisions." Justice Roggensack's opinion, ¶ 20. "Included within the decisions protected by the First Amendment," the opinion contends, "are the hiring and firing of ministerial employees." *Id.*, ¶ 22.

¶ 148. I read Justice Roggensack's bottom line as follows. Even if a church voluntarily enters into a contract limiting the church's options to terminate a ministerial employee, that contract is unenforceable because it involves a "church decision in matters of faith and ministry." *See id.*, ¶¶ 20, 27–28. In other words, a church's ability to arbitrarily fire ministers is so sacrosanct that the church cannot contract around it.

¶ 149. If this rationale were correct, what other kinds of contracts involve "matters of faith and ministry" and would therefore be unenforceable in civil

---

[15] Justice Roggensack's opinion does not even attempt to distinguish these cases, except to note that they did not analyze the more protective language of the Wisconsin Constitution. *Id.*, ¶ 20 n.6. Yet the bulk of the Justice Roggensack's analysis is based not on the Wisconsin Constitution, but rather, on federal case law interpreting the United States Constitution.

courts? Justice Roggensack acknowledges that there are "matters for which a religious institution may contract that would be appropriate to enforce in the courts," but only those that do not involve "internal church decision[s] that affect[] the faith and mission of the church itself." *Id.*, ¶ 26 n.8. The rule of law offered by Justice Roggensack appears to be incredibly broad.

¶ 150. Such a broad rule of law would unquestionably harm those who enter into contracts with the church. I conclude that it would likewise harm the church itself. As discussed above, it is the certainty that a contract can be enforced in court that gives it value, and the freedom to contract rests on the assumption that valid contracts will be enforced. Once that assumption is undermined, a contract is worth no more than the paper upon which it is printed.

## III

¶ 151. Finally, I turn to address the opinions offered by Justice Crooks and Justice Prosser. They would decide this case based on an interpretation of the contract. As a result, their opinions avoid making determinations about the constitutional issues raised in this appeal. I appreciate the reluctance to unnecessarily decide issues of constitutional importance. However, constitutional avoidance is not a good fit here, given that the basis of the motion before the circuit court, the circuit court's decision,[16] the certification of the court of

---

[16] In passing, the circuit court commented that the termination clause might be illusory. Nevertheless, the circuit court did not base its dismissal of DeBruin's claims on an interpretation of the termination clause. It expressly stated that its decision to dismiss was not based on the contract, and that any remarks about the contract would be "just surplusage." Under

appeals, and the arguments advanced by the parties all involve constitutional issues.

¶ 152. Nevertheless, both Justice Crooks and Justice Prosser avoid the issue before the court and adopt an interpretation of the contract. Justice Crooks contends that the termination clause is illusory and therefore the entire contract is unenforceable.[17] Justice Prosser contends that although the employment contract is enforceable as a whole, the termination clause is illusory because it promises nothing.

¶ 153. I am not persuaded by their interpretations of the termination clause. An important canon of construction is that courts should avoid interpretations of a contract term that render the promise unenforceable because it is illusory. Instead, courts bend over backwards to give contract terms meaning. *See Variance, Inc. v. Losinske,* 71 Wis. 2d 31, 36–37, 237 N.W.2d 22 (1976) ("This court must assume that the parties attempted to enter into a legal and enforceable contract, and an interpretation favoring legality and enforceability should be adopted.").[18]

---

the circuit court's interpretation of *Coulee,* it could not "make further inquiry" into the meaning of the contract. "I don't think I get that far," the court explained.

[17] In *Devine v. Notter,* 2008 WI App 87, ¶ 4, 312 Wis. 2d 521, 753 N.W.2d 557, the court of appeals explained that "[a]n illusory promise is a promise in form only: one that its maker can keep without subjecting him- or herself to any detriment or restriction. An archetypal example of an illusory promise is the statement that 'I promise to do as you ask if I please to do so when the time arrives.' "

[18] *See also Pacemaker Yacht Co. v. N.L.R.B.,* 663 F.2d 455, 459 (3d Cir. 1981) (quoting *Retail Clerks Local 455 v. NLRB,* 510 F.2d 802, 806 n.15 (D.C. Cir. 1975) (referencing the "settled rule of contract interpretation that contract language should

¶ 154. I conclude that there is an alternative interpretation of the termination clause that would give it meaning. The contract does not provide that DeBruin can be terminated for "any cause, as determined by the Parish." Instead, it provides that she "shall not be discharged . . . without good and sufficient cause, which shall be determined by the PARISH."

¶ 155. In the context of a decision to terminate an employee, the phrase "good and sufficient" cause is defined in Wisconsin's common law to mean an employee's failure to perform duties under the contract. *See Millar v. Joint School Dist. No. 2,* 2 Wis. 2d 303, 312, 86 N.W.2d 355 (1957) (holding that a school board could dismiss a teacher "before the expiration of his term of service for good and sufficient cause. If a teacher fails to perform his duties under his contract, the board may discharge him from further service."); *see also Kernz v. J.L. French Corp.,* 2003 WI App 140, ¶ 12, 266 Wis. 2d 124, 667 N.W.2d 751 (asserting that *Millar* provided a common law definition of "good and sufficient cause.").

not be interpreted to render the contract promise illusory or meaningless.")); *Walsh v. Schlecht,* 429 U.S. 401, 408 (1977) ("Since a general rule of construction presumes the legality and enforceability of contracts, ambiguously worded contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable."); *Gibson v. Neighborhood Health Clinics, Inc.,* 121 F.3d 1126, 1131 (7th Cir. 1997) ("Indiana courts will not find that there was a lack of obligation on the part of one party when 'a reasonable and logical interpretation will render the contract valid and enforceable.' "); *Bank of N. Carolina, N.A. v. Rock Island Bank,* 570 F.2d 202, 207 (7th Cir. 1978) ("A construction that will sustain an instrument will be preferred to one that will defeat it.")

¶ 156. It should be unsurprising that the contract gives the termination decision to St. Patrick. After all, it always falls to the employer, rather than the employee, to decide whether an employee will be terminated. The fact that the termination clause gives St. Patrick the right to decide whether there is "good and sufficient cause" does not necessarily render that clause illusory.

¶ 157. Instead, it can be interpreted as an agreement that St. Patrick will evaluate the facts to determine whether the common law definition of "good and sufficient cause" has been met when making a termination decision. That is, under this alternative interpretation, St. Patrick must determine whether DeBruin "fail[ed] to perform [her] duties under the contract," and it will not terminate her unless the answer is yes.[19]

¶ 158. Both Justice Crooks and Justice Prosser fail to address the common law definition of the contract phrase "good and sufficient cause." This common law definition presents a reasonable alternative interpretation that should be considered, particularly in light of the principle that courts should "assume that the parties attempted to enter into a legal and enforceable contract" and adopt "an interpretation favoring legality and enforceability." *See Variance,* 71 Wis. 2d at 36–37.

¶ 159. In sum, I would deny the motion to dismiss for failure to state a claim. At this stage, it is premature to determine whether the claims foster excessive entanglement with religion. Unlike the several opinions above, I would remand for further proceedings. Accordingly, I respectfully dissent.

---

[19] Because there is no factual development on this issue at this point in the litigation, we cannot know why DeBruin was terminated.

¶ 160. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.