# IN THE SUPREME COURT OF IOWA

No. 12–1192

Filed February 7, 2014

**DENNIS H. HAGENOW** and **ROSALEE A. HAGENOW,**

Appellants,

vs.

**BETTY L. SCHMIDT,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, David F. Staudt, Judge.

Plaintiffs appeal from judgment on defense verdict in rear-end collision. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

James W. Carney and George W. Appleby V of Carney & Appleby, P.L.C., Des Moines, for appellants.

Samuel C. Anderson of Swisher & Cohrt, P.L.C., Waterloo, for appellee.

**WATERMAN, Justice.**

In this appeal, we revisit the doctrine of legal excuse and the sudden emergency defense, as applied to a rear-end collision the jury could have found was caused by defendant's stroke and resulting partial loss of vision. Plaintiffs' truck was stopped at a red light in good weather when it was struck by defendant's car. Defendant saw the red light but denied seeing plaintiffs' vehicle. At the emergency room she noticed she could not see to her left. Testing confirmed she had suffered a stroke that caused a partial loss of vision. Defendant's treating neurologist initially noted that it was unclear whether the stroke occurred before or after the accident. Two months before trial, defendant disclosed the neurologist would testify the stroke preceded the accident.

Over plaintiffs' objections, the district court allowed defendant's neurologist to testify and submitted the defense of sudden emergency. The jury found the defendant was not negligent. The court of appeals concluded the evidence supported a defense of legal excuse, but reversed the judgment and remanded the case for a new trial based on erroneous wording in the sudden emergency instruction. We granted defendant's application for further review and ordered supplemental briefing on the applicability of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm, sections 9, 11, and 15—which address sudden emergency, physical incapacitation, and legal excuse—and on whether the jury instructions given were consistent with those provisions.

For the reasons that follow, we conclude that the district court acted within its discretion in allowing the defendant's expert medical testimony and that the evidence was sufficient to submit a legal-excuse defense based on defendant's sudden medical emergency. We further conclude any error in the wording of the instruction was harmless. We

therefore defer to future cases our consideration of the foregoing provisions of the Restatement (Third). We vacate the decision of the court of appeals and affirm the district court judgment for defendant.

## I. Background Facts and Proceedings.

We view the evidence in the light most favorable to the jury verdict. *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 593 (Iowa 1999). On November 10, 2008, Betty Schmidt, then age seventy-five, was in her first car accident, which ended her driving career. Schmidt was returning home alone from grocery shopping, driving her 1999 Buick LeSabre east on University Avenue in Cedar Falls at about 1:30 p.m. The weather was clear and the roads were dry. Schmidt, who wore trifocals, had perceived no problem with her vision or health that would impair her driving. She was feeling fine and had no trouble shopping or driving before she reached the intersection with Cedar Heights Drive. She planned to turn right there and saw the traffic light was red. But, she did not see the pickup truck stopped in the right turn lane, Dennis Hagenow's 2008 GMC Sierra. Schmidt drove into the rear of Hagenow's truck, lodging her vehicle under his. The impact deployed Schmidt's airbags. Both vehicles suffered disabling damage—Hagenow's truck was later deemed totaled—and were towed from the scene. A responding police officer asked Schmidt at the scene if she had been drinking, and she answered "no." She submitted to a Breathalyzer test, which detected no alcohol. The officer cited Schmidt for failing to stop in an assured clear distance.

Schmidt was taken by ambulance to the Sartori Hospital Emergency Room. An hour after arriving, while lying on an emergency room cart, Schmidt realized she was unable to see someone who was speaking to her. She alerted medical staff that she could not see to her

left side.  After a CT scan at 3:15 p.m. and an MRI at 4:44 p.m., Dr. Daniel Miller diagnosed Schmidt's condition as left homonymous hemianopsia, which is the absence of vision in the left side of each eye. This condition is a result of an injury to the brain that affects how a person processes visual information.  Dr. Miller referred Schmidt to a neurologist, Dr. Ivo Bekavac, who concluded Schmidt suffered an acute ischemic infarct, commonly referred to as a stroke, in the right occipital lobe of her brain and that this stroke caused Schmidt's vision loss. Dr. Bekavac noted in Schmidt's chart, "It is not clear whether [the stroke] happened before or after the accident."  Schmidt had never previously suffered a stroke.

Schmidt remained at Sartori Hospital until November 18, when she was transferred to Covenant Hospital for stroke rehabilitation services. That day, her rehabilitation doctor, Dr. Barbara Malicka-Rozek, noted in Schmidt's file, "It was believed she probably had [a transient ischemic attack] versus [a] stroke during driving, and this is how she lost control of her vehicle."  Dr. Malicka-Rozek also commented, "Betty was admitted . . . following a motor vehicle accident that likely occurred following a [transient ischemic attack] or a stroke."  Schmidt was discharged from Covenant on November 26.  Because of her vision loss, she was no longer able to drive.

Dennis and his wife, Rosalee Hagenow, filed a personal injury action against Schmidt on November 1, 2010.  On February 9, 2011, Schmidt filed an answer denying negligence and pleading these affirmative defenses:

> 1.  Defendant was confronted by a sudden medical emergency, not of her own making, providing her with a legal excuse for any failure to observe the

requirements of any statute, ordinances, or common law duties concerning the operation of her vehicle.

2. The sole cause of the accident was an act of God in the form of an unexpected medical emergency.

On April 6, Schmidt served answers to the Hagenows' interrogatories that described her limited recollection of the accident. She answered the "expert" interrogatory by stating, "We have not retained any expert witnesses for purposes of testifying at the time of trial. We do expect the need to call as an expert witness my treating physicians who will testify to my medical condition at the time of the accident." She named Dr. Bekavac as one of her physicians. Meanwhile, the district court entered a scheduling order that set the jury trial for May 1, 2012. The order required the plaintiffs to disclose experts no later than 210 days before trial and defendant to do so 150 days before trial.

On November 29, 2011, Schmidt served a "Designation of experts" that stated her intent to call as an expert at the time of trial, "[t]reating physician, Dr. Ivo Bekavac." The designation also stated she "reserve[d] the right to call [her] other treating physicians and elicit expert testimony from them . . . at trial."

The Hagenows received Dr. Bekavac's medical records that autumn. The Hagenows' counsel wrote to Schmidt's counsel asserting Dr. Bekavac's comment, "It is not clear whether [the stroke] happened before or after the accident," established Schmidt would be unable to prove her stroke occurred prior to the accident. Schmidt's counsel responded on February 21, 2012, explaining:

> When I asked Dr. Bekavac about this statement, he said he made it because there is no way to know with 100% certainty as to when on November 10, 2008 the actual stroke occurred. However, he told me it is his belief that the stroke most likely preceded the accident.

On February 24, Schmidt filed a motion for summary judgment with an affidavit attached from Dr. Bekavac. The affidavit acknowledged his previous notation regarding the uncertainty as to the sequence of Schmidt's stroke and accident, but clarified:

> [I]t is my belief, from the information available to me, that the stroke most likely preceded the accident. The reason for my belief is that the medical evidence does not indicate that the automobile accident was a precipitating cause of Ms. Schmidt's stroke. There is no sign of head trauma caused by the accident. It is significant that Ms. Schmidt reported that she did not lose consciousness but did not see the vehicle ahead of her. If, in approaching the intersection, Ms. Schmidt looked to her right in preparation of a right turn at the intersection, everything straight ahead of her in the left part of her visual field would have disappeared and Ms. Schmidt would not necessarily have perceived her sudden loss of this half of her vision field. The fact that she did not lose consciousness but did not see the vehicle ahead of her would be consistent with her having a stroke in advance of the accident. The fact that Ms. Schmidt first reported the loss of vision after she was in the emergency room for a period of time would make sense and would not change my opinion. The stroke happens quickly and can happen painlessly and she would not likely have known she was having a stroke or that she had lost part of her vision as the stroke occurred because she would still have had binocular vision through the right half of her visual field. Immediately after the accident, during the stress of the event, it would not be surprising that she would not notice she had lost the left side of her vision. It makes sense that following the accident, after the stress of the accident starts to die off and she is stationary in an emergency room, looking about the room, that she would begin noticing her loss of vision.
>
> In conclusion, it is my professional opinion to a reasonable degree of medical certainty that Ms. Schmidt suffered an acute right occipital infarct on November 10, 2008 and that it is more probable than not that the stroke occurred immediately preceding the automobile accident.

On March 5, the Hagenows designated a rebuttal expert, Dr. David Friedgood. The same day, the Hagenows filed a resistance to Schmidt's motion for summary judgment and cross-motion for partial summary judgment on liability, and a motion to exclude Dr. Bekavac's testimony

on grounds of late disclosure. The court held an unreported hearing on March 21. At that hearing, the court orally advised counsel it would allow Dr. Bekavac to testify and directed the parties to cooperate in scheduling depositions of Drs. Bekavac and Friedgood before trial. On March 29, the Hagenows filed a motion to reconsider and, on April 16, filed a motion in limine seeking the exclusion of Dr. Bekavac's testimony. Attached to this motion was an affidavit from Dr. Friedgood, which opined that Schmidt suffered her stroke one hour after the accident, while she was in the emergency room.

On April 17, the district court filed written orders denying the Hagenows' motions to exclude Dr. Bekavac's testimony. The court stated:

> This is not a case where the plaintiffs were unaware of the existence of an expert. This is also not a case in which the plaintiffs were unaware the treating physician had a professional medical opinion. This is merely a case in which the treating physician, for whatever reason, now has a different opinion than the opinion he expressed earlier.

The district court acknowledged the timing was "unfortunate," but pointed out that Schmidt had informed the Hagenows of Dr. Bekavac's changed opinion more than thirty days prior to trial, as required by Iowa Rule of Civil Procedure 1.508(3). The district court offered the Hagenows' counsel a continuance "should he determine he is unable to adequately prepare and obtain the necessary expert opinion prior to trial in May." Dr. Bekavac was deposed on April 9, and Dr. Friedgood was deposed on April 25.

On April 26, the district court denied both parties' motions for summary judgment. The district court noted that Dr. Bekavac and Dr. Friedgood presented conflicting opinions regarding the timing of

Schmidt's stroke, and therefore, the court found Schmidt's sudden emergency defense presented a genuine issue of material fact.

The Hagenows did not request a continuance, and trial began May 1, as scheduled. Schmidt testified that she was living independently at the time of the accident and drove nearly every day. She believed she was in fine health on the day of the accident and had no reason to know she would suffer a stroke that day. Her memory of the accident and subsequent events was incomplete. Though she did not remember her speed, she testified that she had a practice of driving a little under the speed limit. She recalled approaching the red light and preparing to signal a right-hand turn. The last thing she remembered "was seeing the red light at the intersection and thinking I needed to stop." She testified she did not remember seeing the Hagenows' truck stopped in front of her at the intersection, nor did she remember the impact or her airbags going off. She did, however, recall speaking with the police officer at the scene. She also remembered speaking with a medical responder, though she did not remember her resulting trip to the emergency room in an ambulance. Despite her spotty memory, Schmidt denied that she lost consciousness.

Drs. Bekavac and Friedgood testified by deposition. They disagreed whether Schmidt's stroke occurred before or after the accident. Dr. Bekavac testified that Schmidt's stroke preceded the accident, while Dr. Friedgood testified the stroke occurred in the emergency room at the time Schmidt noted her vision loss. But, the experts agreed on a number of issues. Both experts agreed Schmidt suffered a stroke on November 10, 2008. Both experts agreed the right occipital lobe processes the information from one's left visual field. Both agreed that, because of the stroke, Schmidt suffered homonymous hemianopsia and

lost half of her visual field. Both agreed Schmidt would not have been able to drive her car successfully with that condition.

Moreover, both agreed that what Schmidt could see depended on how she had her head or eyes turned. Dr. Bekavac explained that, if Schmidt was looking at his face and he held his hand to her left side, she would be unable to see his hand. Dr. Friedgood stated that, if Schmidt was looking straight forward, she would only "see" from her nose over to her right. Dr. Bekavac noted that, due to this phenomenon, Schmidt would be unable to see a car directly ahead of her if she were looking even three-quarters to her right. Schmidt herself gave examples to illustrate the extent of her vision loss, noting she has difficulty reading because she can see only the right half of the page of a book when viewing it straight ahead. She explained that she can only see half of a dinner plate on a table while eating and noted that she had knocked over her drink several times lately because it was placed to the left side of her plate. Nevertheless, Schmidt does not "see blackness" in the left half of her vision. As Dr. Friedgood explained, no one can see 360°. Yet, a person does not see blackness for the 180°; they simply do not "see" anything.

Schmidt proposed jury instructions regarding sudden emergency and legal excuse. The Hagenows objected to submission of the sudden emergency defense, arguing no factual foundation existed for the instructions because no expert testified to a reasonable degree of medical certainty that Schmidt suffered a stroke that rendered her incapable of operating a vehicle. The Hagenows also argued that, if a sudden emergency instruction was provided, "there should be a specific requirement that the jury find [the stroke caused the] impairment to Betty Schmidt to the extent that she could not operate her motor

vehicle." The district court overruled the Hagenows' objections and declined their request to provide causation language within the sudden emergency instruction.[1]

At Schmidt's request, the district court submitted an instruction modeled after Iowa Civil Jury Instruction 600.75.[2] This instruction, No. 19, stated:

> A sudden emergency is an unforeseen combination of circumstances that calls for immediate action or a sudden or unexpected occasion for action. A driver of a vehicle who, through no fault of her own, is placed in a sudden emergency, is not chargeable with negligence if the driver exercises that degree of care which a reasonably careful person would have exercised under the same or similar circumstances.

For Instruction No. 20, the district court submitted an instruction based upon Iowa Civil Jury Instruction 600.74,[3] as proposed by Schmidt. This instruction stated:

---

[1]The Hagenows do not appeal the district court's refusal to include their requested causation language within the instruction.

[2]Uniform instruction 600.75, captioned "Sudden Emergency," states:

A sudden emergency is an unforeseen combination of circumstances that calls for immediate action or a sudden or unexpected occasion for action. A driver of a vehicle who, through no fault of [his] [her] own, is placed in a sudden emergency, is not chargeable with negligence if the driver exercises that degree of care which a reasonably careful person would have exercised under the same or similar circumstances.

Iowa State Bar Ass'n, *Iowa Civil Jury Instructions* 600.75 (2012).

[3]Uniform instruction 600.74, captioned "Legal Excuse," states:

(Name) claims that if you find that [he] [she] violated the law in the operation of [his] [her] vehicle, [he] [she] had a legal excuse for doing so because (excuse) and, therefore, is not negligent. "Legal excuse" means that someone seeks to avoid the consequences of [his] [her] conduct by justifying acts which would otherwise be considered negligent. The burden is upon (name) to establish as a legal excuse:

1. Anything that would make complying with the law impossible.

Betty Schmidt claims that if you find that she violated the law in the operation of her vehicle, she had a legal excuse for doing so because of a sudden medical emergency and, therefore, is not negligent. "Legal excuse" means that someone seeks to avoid the consequences of his or her conduct by justifying acts which would otherwise be considered negligent. The burden is upon Betty Schmidt to establish as a legal excuse:

1. That Betty Schmidt had no control over the sudden medical emergency she alleges occurred which placed her vehicle in a position contrary to the law.

2. That her failure to obey the law when she was confronted with a sudden medical emergency was not a circumstance of her own making.

If you find that Betty Schmidt has violated the law as submitted to you in other instructions and that she has established a legal excuse for doing so under either of the two definitions set forth above, then you should find that Betty Schmidt was not negligent for violating the particular law involved.

On May 7, 2012, the jury returned a verdict in favor of Schmidt, answering "no" to the first question, "Was the defendant, Betty Schmidt, at fault?"

The Hagenows moved for a judgment notwithstanding the verdict or new trial, arguing Schmidt "failed to prove there was a stroke that transpired prior to the collision in question and most importantly that the stroke in any manner impaired Mrs. Schmidt in the operation of her

---

2. Anything over which the driver has no control which places [his] [her] vehicle in a position contrary to the law.

3. Failure to obey the law when the driver is confronted with sudden emergency not of [his] [her] own making.

4. An excuse or exception provided by the law.

If you find that (name) has violated the law as submitted to you in other instructions, and that [he] [she] has established a legal excuse for doing so under any one of the four definitions set forth above, then you should find that (name) was not negligent for violating the particular law involved.

Iowa State Bar Ass'n, *Iowa Civil Jury Instructions* 600.74.

vehicle." The district court denied this motion. The Hagenows appealed, arguing the district court erred in failing to exclude Dr. Bekavac's testimony and in instructing the jury on sudden medical emergency. We transferred the case to the court of appeals. In its opinion, the court of appeals stated:

> Because there was testimony, albeit disputed testimony, that Schmidt experienced a stroke depriving her of her left visual field before the accident, *we believe an instruction as to legal excuse was warranted by the evidence*—if Schmidt was unable to see Hagenow's vehicle, it would have been impossible or beyond her control to have stopped behind him.

(Emphasis added.) But, the court of appeals further concluded "the type of legal excuse warranted by the evidence was not included in the instructions given." Focusing on the language in the sudden emergency instruction that "calls for immediate action or a sudden or unexpected occasion for action," the court of appeals queried, "if Schmidt did not know she had a stroke or lost a portion of her visual field, what action was called for under the circumstances?" Based on this perceived disconnect between the language of the instruction and the facts, the court of appeals held the sudden emergency instruction was "neither applicable nor supported by the evidence." The court of appeals therefore reversed the judgment in favor of Schmidt and ordered a new trial. Because the court of appeals found the jury instruction issue dispositive, it did not decide whether the district court abused its discretion by allowing Dr. Bekavac to testify.

We granted Schmidt's application for further review.

## II. Scope of Review.

We review for abuse of discretion discovery rulings on whether to exclude evidence as a sanction for untimely disclosure. *Whitley v. C.R.*

*Pharmacy Serv., Inc.*, 816 N.W.2d 378, 385 (Iowa 2012). "[W]e will not reverse the court's decision to admit evidence unless the record shows prejudice to the complaining party." *Id.* We likewise review for abuse of discretion rulings allowing or disallowing expert testimony challenged as untimely and "accord the trial court broad discretion." *Klein v. Chi. Cent. & Pac. R.R.*, 596 N.W.2d 58, 60–61 (Iowa 1999) (affirming district court's exclusion of opinion testimony of company physician due to late disclosure). "An abuse of discretion consists of a ruling which rests upon clearly untenable or unreasonable grounds." *Lawson v. Kurtzhals*, 792 N.W.2d 251, 258 (Iowa 2010).

"We review a claim that the district court gave an instruction not supported by the evidence for correction of errors at law." *Pavone v. Kirke*, 801 N.W.2d 477, 494 (Iowa 2011). "We review the related claim that the trial court should have given [a party's] requested instructions for an abuse of discretion." *Crawford v. Yotty*, 828 N.W.2d 295, 298 (Iowa 2013) (internal quotation marks omitted). "We evaluate the alleged instructional error from the perspective that a trial court is generally required to give a requested instruction 'when it states a correct rule of law having application to the facts of the case.'" *Pexa v. Auto Owners Ins. Co.*, 686 N.W.2d 150, 160 (Iowa 2004) (quoting *Stover v. Lakeland Square Owners Ass'n*, 434 N.W.2d 866, 868 (Iowa 1989)).

We will affirm the submission of an instruction if substantial evidence supports it. *See Jones v. Blair*, 387 N.W.2d 349, 352 (Iowa 1986). "Substantial evidence is that which a reasonable person would find adequate to reach a conclusion." *Greenwood v. Mitchell*, 621 N.W.2d 200, 204 (Iowa 2001) (internal quotation marks omitted). In reviewing whether a sudden emergency instruction was properly submitted, we view the evidence in the light most favorable to the party asserting the

defense. *Weiss v. Bal*, 501 N.W.2d 478, 481 (Iowa 1993); *see also Blair*, 387 N.W.2d at 352. "Error in giving or refusing to give a jury instruction does not warrant reversal unless it results in prejudice to the complaining party." *Koenig v. Koenig*, 766 N.W.2d 635, 637 (Iowa 2009) (internal quotation marks omitted). "Instructions must be considered as a whole, and if the jury has not been misled there is no reversible error." *Thavenet v. Davis*, 589 N.W.2d 233, 236 (Iowa 1999).

**III. Whether the District Court Abused Its Discretion by Allowing Dr. Bekavac to Testify on Causation.**

The Hagenows argue the district court erred in allowing Dr. Bekavac's expert opinion testimony—disclosed sixty-seven days before trial—that Schmidt's stroke occurred before the accident. They argue Schmidt failed to timely supplement her discovery responses on expert testimony as required by Iowa Rule of Civil Procedure 1.508(3).[4] We conclude the district court did not abuse its discretion by allowing Dr. Bekavac's expert medical opinion because Schmidt disclosed his opinion more than two months before trial and the Hagenows suffered no unfair prejudice. Specifically, the Hagenows declined a continuance and

---

[4]A treating physician may become subject to expert disclosure requirements when his trial testimony is based on "factual knowledge, mental impressions and opinions . . . 'acquired or developed in anticipation of litigation or for trial.' " *Day v. McIlrath*, 469 N.W.2d 676, 677 (Iowa 1991). Moreover, if a "treating physician assumes a role in litigation analogous to the role of a retained expert, supplemental discovery . . . could become obligatory." *Id.* Dr. Bekavac testified on causation, specifically, that Schmidt's stroke preceded the accident and explains her failure to see the Hagenow vehicle. His 2012 trial testimony thereby went beyond his diagnosis and treatment of her stroke in 2008. We conclude Dr. Bekavac's opinion on causation was subject to the disclosure and supplementation requirements of Iowa Rule of Civil Procedure 1.508 governing experts. *Cf. Hansen v. Cent. Iowa Hosp. Corp.*, 686 N.W.2d 476, 484 (Iowa 2004) (holding physician "was not within the ambit of [Iowa Code] section 668.11," which governs expert disclosures in professional malpractice cases, when his opinion on causation was formed treating the plaintiff). Schmidt indeed formally designated Dr. Bekavac as an expert witness on November 29, 2011, complying with the deadline to disclose defense experts 150 days before the trial set for May 1, 2012.

had time to depose Dr. Bekavac and obtain a rebuttal expert, Dr. Friedgood, before trial.

Rule 1.508 governs "Discovery of experts." Rule 1.508(1)(*a*) provides:

> A party may through interrogatories require any other party . . . to state, with reasonable particularity, all of the following:
>
> (1) The subject matter on which the expert is expected to testify.
>
> (2) The designated person's qualifications to testify as an expert on such subject.
>
> (3) The mental impressions and opinions held by the expert and the facts known to the expert (regardless of when the factual information was acquired) which relate to, or form the basis of, the mental impressions and opinions held by the expert.

Iowa R. Civ. P. 1.508(1)(*a*).

Rule 1.508(3) addresses when supplemental discovery is required, and provides in full:

> If a party expects to call an expert witness . . . *when the substance of an expert's testimony has been updated, revised or changed since the response*, such response must be supplemented to include the information described in rule 1.508(1)(*a*)(1) to (3), *as soon as practicable, but in no event less than 30 days prior to the beginning of trial except on leave of court.* If the identity of an expert witness and the information described in rule 1.508(1)(*a*)(1) to (3) are not disclosed or supplemented in compliance with this rule, the court *in its discretion may exclude or limit the testimony of such expert,* or make such orders in regard to the nondisclosure as are just.

*Id.* r. 1.508(3) (emphasis added). This rule required Schmidt to supplement her discovery responses to disclose Dr. Bekavac's opinion that the stroke preceded the accident.

Compliance with both the "as soon as practicable" and the "thirty day" requirements is necessary, as "the two requirements are cumulative

so that violation of either amounts to noncompliance." *Stephenson v. Furnas Elec. Co.*, 522 N.W.2d 828, 831 (Iowa 1994). "Consistent with the discovery rules in general, the duty to supplement seeks to clarify issues prior to trial, avoid surprise to parties, and allow a complete opportunity to prepare for trial." *Whitley*, 816 N.W.2d at 386 (noting "parties seeking discovery should normally be justified in believing they have received substantially all the information requested").

As rule 1.508(3) provides, the district court may order sanctions for violations. *See Whitley*, 816 N.W.2d at 388. This decision "rests with the sound discretion of the trial court," *id.*, and "[w]e have been slow to find an abuse of discretion," *Sullivan v. Chi. & Nw. Transp. Co.*, 326 N.W.2d 320, 324 (1982) (finding no abuse of discretion in trial court's exclusion of testimony based on discovery violation); *see also, e.g., Whitley*, 816 N.W.2d at 388–89 (affirming district court's decision to grant a continuance rather than exclude evidence); *Lawson*, 792 N.W.2d at 260 (affirming district court's limitation of evidence based on late supplementation that "came days before trial and after one continuance"). In reviewing a district court's ruling in a discovery matter, we remain mindful that

> [a] trial should be a search for the truth, and our rules of discovery are an avenue to achieving that goal. The discovery process seeks to make a trial into a fair contest with the basic issues and facts disclosed to the fullest practicable extent.

*Whitley*, 816 N.W.2d at 386 (internal quotation marks omitted).

We must determine whether the district court appropriately considered the available options. In *Whitley*, we reiterated that the district court should consider the following factors:

> "1. the parties' reasons for not providing the challenged evidence during discovery;

2. the importance of the evidence;

3. the time needed for the other side to prepare to meet the evidence; and

4. the propriety of granting a continuance."

*Id.* at 388 (quoting *Lawson*, 792 N.W.2d at 259). "While the sanction for the failure to supplement discovery can include exclusion of the evidence at trial, the trial court can also deny a request to exclude evidence." *Id.* Exclusion of an expert is an extreme sanction and "is justified only when prejudice would [otherwise] result." *Lambert v. Sisters of Mercy Health Corp.,* 369 N.W.2d 417, 422 (Iowa 1985) (internal quotation marks omitted).

Schmidt informed the Hagenows of Dr. Bekavac's revised opinion sixty-seven days before trial, well before the requirement in rule 1.508(3) to supplement responses at least thirty days before trial.[5] The Hagenows do not claim that Schmidt knew of Dr. Bekavac's revised opinion earlier and thereby failed to disclose it "as soon as practicable" under that rule.

Significantly, the Hagenows have not shown they were prejudiced by the disclosure of Dr. Bekavac's revised opinion just over two months before trial. The Hagenows were able to retain a rebuttal expert ten days later, with trial still seven weeks away. The parties deposed both experts before trial. The district court offered the Hagenows' counsel a continuance, which he declined. We hold the district court acted within

---

[5]Plaintiffs' experienced trial counsel was on notice since Schmidt's answer filed on February 9, 2011, that defendant claimed a sudden medical emergency caused the accident. Discovery responses, served April 6, stated defense counsel may call treating physicians to give opinion testimony at trial, including Dr. Bekavac. The records of Schmidt's rehabilitation physician, Dr. Malicka-Rozek, indicated the stroke preceded and caused the accident. Her records were produced to the Hagenows' counsel by autumn 2011. Schmidt's formal designation of Dr. Bekavac as a testifying expert on November 29 reserved her right to elicit opinion testimony at trial from other treating physicians. For these reasons, disclosure of Dr. Bekavac's causation opinion on February 24, 2012, may not have been a complete surprise to the Hagenows.

its discretion by allowing Dr. Bekavac's expert opinion testimony. We therefore affirm the rulings denying Hagenows' motions to exclude Dr. Bekavac's testimony at trial. Accordingly, his testimony may be considered in deciding the next issue—whether the evidence was sufficient to submit a defense based on legal excuse or sudden emergency.

### IV. Whether the District Court Committed Reversible Error in Submitting the Sudden Emergency Instruction.

The Hagenows had the burden to prove Schmidt's negligence. Crashing into a pickup truck stopped at a red light ordinarily would constitute negligence per se. But, what if the reason Schmidt failed to see the Hagenows' vehicle stopped in front of her is that her unforeseen stroke caused a sudden loss of vision? How did she fail to exercise reasonable care if she was unaware of her loss of vision before the crash? We must determine whether the district court committed reversible error in instructing the jury on Schmidt's sudden medical emergency under these circumstances. We review the evidence in the light most favorable to Schmidt as the party asserting the defense. *See Weiss*, 501 N.W.2d at 481. We begin our analysis with a look at the law of legal excuse and sudden emergency.

"The doctrine of legal excuse permits the jury to excuse a defendant's failure to obey statutory law when confronted with an emergency not of his or her own making." *Id.* at 480. We have identified four categories of legal excuse:

> (1) anything that would make it impossible to comply with the statute or ordinance;
>
> (2) anything over which the driver has no control which places the driver's motor vehicle in a position contrary to the provisions of the statute or ordinance;

(3) where the driver of the motor vehicle is confronted by an emergency not of the driver's own making, and by reason of such an emergency, the driver fails to obey the statute; and

(4) where a statute specifically provides an excuse or exception.

*Rowling v. Sims*, 732 N.W.2d 882, 885 (Iowa 2007) (internal quotation marks omitted). "A jury should only be instructed on the category of legal excuse supported by the evidence." *Id.*[6]

"Unlike the doctrine of legal excuse—which exonerates a party from liability for negligence per se—the sudden emergency doctrine is merely an expression of the reasonably prudent person standard of care."[7] *Weiss*, 501 N.W.2d at 481. "It expresses the notion that the law

---

[6]On appeal, the Hagenows argue the sudden emergency instruction was inappropriate because "[i]t is impossible for [Schmidt] to offer competent medical evidence that her knowledge of pre-existing medical conditions did not impair her ability to drive with due care." In a conclusory fashion, they list ailments from Schmidt's medical history, including headaches and sleep apnea, to allege she "contributed to the creation of the emergency." The Hagenows did not make this specific objection to the sudden emergency instruction at trial, and in any event, it lacks merit. Schmidt's own testimony refutes the Hagenows' argument, showing she was able to drive without incident up until the time of her stroke. We conclude her medical history did not rise to a level that, as a matter of law, she should have anticipated her stroke and refrained from driving. Her defense was for the jury. This is not a case in which a driver was beginning to experience symptoms and could have pulled over before the accident, nor is it a case in which a medical emergency resulted from the driver's careless failure to take medications.

[7]In *Weiss*, we declined the opportunity to abandon the sudden emergency instruction, despite our recognition "that the doctrine of sudden emergency has come under increasing attack in recent years." 501 N.W.2d at 480. We did so after an analysis of conflicting authorities led us to the conclusion that "a jury may be aided by a succinct and narrowly drafted instruction that tells it the actor is held only to the standard of reasonable care under the circumstances posed by the emergency." *Id.* at 481.

The Colorado Supreme Court is the latest to abolish the sudden emergency doctrine. *Bedor v. Johnson*, 292 P.3d 924, 927–31 (Colo. 2013) (collecting cases). Two dissenting justices favored retaining the sudden emergency defense. Justice Boatwright relied on stare decisis:

The majority abolishes the sudden emergency instruction in Colorado negligence law because it states that this legal principle's potential to mislead the jury greatly outweighs its minimal utility. Our earlier precedent rejected this view because we determined this doctrine

requires no more from an actor than is reasonable to expect in the event of an emergency." *Id.* We have repeatedly defined "sudden emergency" as

> "(1) an unforeseen combination of circumstances which calls for immediate action; (2) a perplexing contingency or complication of circumstances; [or] (3) a sudden or unexpected occasion for action, exigency, pressing necessity."

*Vasconez v. Mills*, 651 N.W.2d 48, 54 (Iowa 2002) (quoting *Foster v. Ankrum*, 636 N.W.2d 104, 106 (Iowa 2001)).

In the case before us, Instruction No. 19 defined "sudden emergency" as "an unforeseen combination of circumstances that calls for immediate action or a sudden or unexpected occasion for action." It also reflected a reasonable person standard, stating:

> A driver of a vehicle who, through no fault of her own, is placed in a sudden emergency, is not chargeable with negligence if the driver exercises that degree of care which a reasonably careful person would have exercised under the same or similar circumstances.

We have held a sudden emergency instruction is inappropriate if the "emergency" is of the type that a reasonably prudent person should be prepared for or if the circumstances allowed a defendant time to assess the situation. *See id.* at 54–55 (holding sudden emergency instruction was inappropriate when driver failed to see biker riding on the side of the road); *Foster*, 636 N.W.2d at 107 (rejecting sudden

---

was helpful to the jury. Nothing has changed since we reached this conclusion and stare decisis dictates that we continue to give effect to our earlier pronouncements.

*Id.* at 932 (Boatwright, J., dissenting); *see also Moran v. Atha Trucking, Inc.*, 540 S.E.2d 903, 913 (W. Va. 1997) (retaining sudden emergency defense with comparative fault system after thorough review of criticism and conflicting authorities in other jurisdictions). No party in this case has asked us to abandon the sudden emergency doctrine.

emergency instruction when defendant had ten to fifteen seconds to deliberate); *Weiss*, 501 N.W.2d at 482 (denying instruction when "[t]he facts reveal no more than the everyday hazard of driving through a school parking lot and the not uncommon appearance of pedestrians crossing the traveled way to reach their parked cars"). Whether a sudden emergency occurred is typically a fact question entrusted to the jury. *See Weiss*, 501 N.W.2d at 481. The burden is on the party asserting the defense. *Blair*, 387 N.W.2d at 352. "[I]f there is substantial evidence that an emergency had developed, the jury should be instructed thereon." *Bangs v. Keifer*, 174 N.W.2d 372, 374 (Iowa 1970).

**A. The Evidence Was Sufficient to Submit a Defense Based on Sudden Emergency or Legal Excuse.** The Hagenows argue a sudden emergency instruction was inappropriate because the evidence was insufficient to prove that Schmidt suffered a stroke prior to the accident or that her stroke caused the accident. They assert Schmidt's testimony that she was able to see the red light as she approached the intersection and that she did not lose consciousness proves she did not suffer her stroke before the accident. They argue "there simply is no competent medical evidence to support such a finding despite [Dr. Bekavac's testimony]" and describe Schmidt's evidence as "speculative at best." The Hagenows point to the fact that Schmidt did not report her vision loss until over an hour after arriving at the hospital as evidence the stroke occurred after the accident. They also contend that, even assuming Schmidt's stroke occurred prior to the accident, this would not establish a sudden emergency defense because her vision loss occurred only in the left half of both of her eyes and would not have prevented her from viewing the Hagenows' vehicle directly in front of her.

We disagree. The Hagenows' insufficiency argument collapses upon our determination that Dr. Bekavac's testimony was properly admitted. Reviewing all the evidence—including Dr. Bekavac's testimony—in the light most favorable to Schmidt and "taking into consideration all reasonable inferences that could be fairly made by the jury," *Kiesau v. Bantz*, 686 N.W.2d 164, 171 (Iowa 2004), we hold the evidentiary record supports submission of a legal-excuse defense based on Schmidt's sudden medical emergency.

Drs. Friedgood and Bekavac agreed Schmidt suffered a stroke on the afternoon of November 10, 2008, that caused permanent loss of the left half of her vision in both eyes. Though Dr. Bekavac conceded he could not definitively determine when the stroke occurred, medical evidence supported his opinion that the stroke most likely preceded the accident. Dr. Bekavac explained there was no evidence that Schmidt suffered head trauma during the accident that would have precipitated the stroke. Dr. Bekavac found it significant that Schmidt did not report losing consciousness before or after the accident, but rather reported confusion. Dr. Friedgood confirmed that "[c]onfusion can be a symptom of a stroke."

Both experts testified Schmidt could have lost half of her vision before the accident and yet failed to notice it until later at the hospital. Dr. Bekavac noted that a stroke happens quickly and often painlessly, and he was unsurprised Schmidt failed to realize she had suffered one. Dr. Friedgood agreed that when a person loses only half of his or her normal field of vision, that person could initially be unaware of the loss. This is because the left half of a person's vision does not "go black" upon suffering a stroke. Rather, a person would simply be unable to perceive the left half of his or her range of vision, in the same way that people are

unable to perceive what is behind them but do not "see" blackness. Dr. Friedgood commented, "Eventually they become aware of it reflexively and then they deal with it, but initially they may not be aware, and that's why they bump into things and get into trouble."

Finally, because of the nature of her vision loss, it was possible Schmidt could have observed the red light and yet failed to perceive the Hagenows' vehicle. Both experts discussed how the loss of vision in the left half of both of her eyes would have negatively affected Schmidt's ability to drive. Dr. Friedgood noted that Schmidt's ability to perceive objects in front of her would depend upon how she moved her head and eyes: if her eyes or head turned to the right, she would be unable to see objects directly in front of her because they would be on the left side of her field of vision. As Dr. Bekavac testified, if Schmidt looked to her right in preparation of a right turn at the intersection, everything straight ahead of her, now in the left part of her visual field, would have disappeared.

Based on this evidence, a reasonable juror could find that Schmidt rear-ended the Hagenows' vehicle because of her stroke and loss of vision. We conclude the evidence was sufficient to submit the defense.

**B. Any Error in the Wording of the Sudden Emergency Instruction Was Harmless.** The Hagenows next argue the wording of the sudden emergency instruction did not fit the facts. Instruction 19 required the jury to find the emergency was an "unforeseen combination of circumstances that calls for immediate action or a sudden or unexpected occasion for action." Schmidt, however, was unaware of her vision loss and thus had no sudden choice or action to take. The court of appeals reversed on that basis. Our court has never squarely

addressed the applicability of the sudden emergency defense under these circumstances.

In *Weiss*, we listed "a sudden heart attack" as an example of a situation that could warrant a sudden emergency instruction. 501 N.W.2d at 482; *see also Fitas v. Estate of Baldridge*, 657 N.E.2d 323, 326–27 (Ohio Ct. App. 1995) (finding heart attack suffered by driver of automobile created sudden emergency that precluded liability of driver or his wife); *Diaz v. Sopade*, 893 N.Y.S.2d 164, 165 (App. Div. 2010) (concluding sudden emergency defense applied to motorist who, after being assaulted by his passenger and rendered unconscious, struck a bicyclist). Quoting section 13 of the American Jurisprudence Proof of Facts Third, our court of appeals in this case concluded a sudden emergency instruction is intended *only* for circumstances in which a defendant "has *acted in response* to a perceived peril and has *made a choice* which in hindsight may be regarded as unwise or ill-considered, but which was not unreasonable or imprudent under the stress of surrounding circumstances." 8 Am. Jur. Proof of Facts 3d § 13, at 424 (1990 & Supp. 2013) (emphasis added); *see also Bardwell v. McLaughlin*, 520 S.W.2d 277, 278–79 (Ark. 1975) (holding sudden emergency instruction inappropriate when "it was physically impossible for appellee to make a decisional act"); *Hancock-Underwood v. Knight*, 670 S.E.2d 720, 726 (Va. 2009) (holding driver who suffered acute medical crisis and lost consciousness was not entitled to sudden emergency instruction because "[t]here was no action he could take or did take"). Under this view, "[w]here the actor has not made a decisional act in response to peril, either because he was unaware of the peril, or where he perceived the peril but did not have time to react to it, the doctrine logically has no application." 8 Am. Jur. Proof of Facts 3d § 13, at 424.

The Restatement (Third) of Torts: Liability for Physical and Emotional Harm includes a separate section for disability—which does not require advanced awareness or a rapid response. We have not previously considered adopting the provisions of the Restatement (Third) relevant to a sudden medical emergency. Section 11(b) on sudden incapacitation best fits the facts of this case.[8] *Cf. Weiss*, 501 N.W.2d at

---

[8]Section 11(b) of the Restatement, entitled "Disability," provides:

> The conduct of an actor during a period of sudden incapacitation or loss of consciousness resulting from physical illness is negligent only if the sudden incapacitation or loss of consciousness was reasonably foreseeable to the actor.

Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 11(b), at 130 (2005). Comment *d* to section 11 explains, "[s]udden incapacitation can be caused by a heart attack, *a stroke*, an epileptic seizure, diabetes, or other medical conditions." *Id.* § 11 cmt. *d*, at 131 (emphasis added). Significantly, section 11(b) does not require the driver's contemporaneous awareness of his medical emergency, nor a rapid decision or action to be taken, as that would be impossible for a person who is unconscious or incapacitated. Comment *d* elaborates:

> A typical case is sudden incapacitation that causes a driver to lose control of the car. This is distinctly dangerous and substandard driving which, absent the incapacitation, would easily merit a finding of negligence. Even so, when the incapacitation is itself unforeseeable, it follows that no reasonable precautions were available to the driver that could have avoided the risk of harm.

*Id.* Relatedly, section 15 of the Restatement (Third), entitled "Excused Violations," states that a statutory violation is excused if "the violation is reasonable in light of the actor's childhood, physical disability, or physical incapacitation." *Id.* § 15(a), at 168.

Unlike section 11(b), the Restatement's "emergency" provision, section 9, requires a rapid response. This provision provides: "If an actor is confronted with an unexpected emergency requiring rapid response, this is a circumstance to be taken into account in determining whether the actor's resulting conduct is that of the reasonably careful person." *Id.* § 9, at 111. The Restatement (Third) defines "emergency" as

> the kind of event that prevents reasonable persons from exercising the kind of good judgment that such persons ordinarily exercise. An emergency is an event that requires a decision within an extremely short duration and that is sufficiently unusual so that the actor cannot draw on a ready body of personal experience or general community knowledge as to which choice of conduct is best.

*Id.* § 9 cmt. *b*, at 112.

482 (recognizing "a sudden heart attack" may support a sudden emergency defense). The evidence supported a finding that Schmidt suffered a stroke that caused her to lose vision, resulting in the rear-end collision when she failed to see the Hagenow vehicle. She had no forewarning of the stroke. But, neither the parties nor the district court raised the provisions of the Restatement (Third) when instructing the jury in this case. We defer for another day our consideration of these provisions of the Restatement (Third) because we hold the submission of the instruction did not prejudice the Hagenows, and we affirm the judgment for Schmidt without a retrial. *Cf. Thompson v. Kaczinski*, 774 N.W.2d 829, 839–40 (2009) (reversing summary judgment for defendant and remanding for trial under scope of liability provisions of the Restatement (Third) adopted in that opinion).

Any error in the wording of the sudden emergency instruction given was harmless. *See Koenig*, 766 N.W.2d at 637 (noting only prejudicial error requires reversal). The alleged erroneous wording in the instruction made it *more difficult* for Schmidt to prove her sudden emergency defense. That wording defined emergency as an "unforeseen combination of circumstances that calls for immediate action or a sudden or unexpected occasion for action." The Hagenows thereby benefited from any error in the wording of the sudden emergency instruction, such that the alleged error was nonprejudicial to them. *See Wells v. Enter. Rent-A-Car Midwest*, 690 N.W.2d 33, 38 (Iowa 2004) (holding a challenged special interrogatory "treated [appellants] more favorably than the facts warranted [and,] [c]onsequently, there was no prejudice in submitting [the special interrogatory] to the jury"); *Sheets v. Ritt, Ritt & Ritt, Inc.*, 581 N.W.2d 602, 607 (Iowa 1998) (holding instructional error was harmless because "[appellant] is unable to show

how her chance of recovery would have actually improved under the instructions she requested").

In order to return a defense verdict in this rear-end collision case, the jury must have found that Schmidt's stroke caused the accident. As the court of appeals and district court concluded, Schmidt was entitled under the evidence to an instruction on legal excuse. The Hagenows fail to show the alleged instructional error was prejudicial because they offer no reason that omission of the challenged wording would have led to a different verdict. *See Sheets*, 581 N.W.2d at 607 (rejecting challenge to jury instructions when appellant was "unable to establish that the jury might have reacted differently under her proposed instructions"). "Given the clear focus of the experts' disagreement, we do not see how the jury could have been misled by the court's instruction." *Estate of Hagedorn ex rel. Hagedorn v. Peterson*, 690 N.W.2d 84, 90 (Iowa 2004). Accordingly, we conclude the district court correctly denied the Hagenows' motion for new trial.

**V. Disposition.**

For the foregoing reasons, we vacate the decision of the court of appeals and affirm the district court's judgment in favor of Schmidt.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**